[Crim. No. 21370. Feb. 29, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEJANDRO GILBERT RUIZ, Defendant and Appellant.

590

COUNSEL

James Larson, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert R. Anderson and Gary R. Hahn, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—Defendant Alejandro Gilbert Ruiz appeals from a judgment imposing the death penalty following his conviction of two counts of first degree murder (Pen. Code, §§ 187, 189; all further statutory references are to this code unless otherwise indicated), and one count of second degree murder (*ibid.*), accompanied by multiple-murder special-circumstance (former § 190.2, subd. (c)(5)) and firearm-use (§ 12022.5) findings. As will appear, we conclude that the judgment should be affirmed in its entirety.

## I. THE FACTS

Defendant was charged with killing two of his wives, Tanya and Pauline, and the son of Pauline (defendant's stepson Tony). The jury found defend-

ant guilty of murder in the first degree as to both Pauline and Tony, and guilty of murder in the second degree as to Tanya. Because the evidence of defendant's guilt of these offenses was largely circumstantial, we review the underlying facts in some detail.

A. *Tanya Ruiz*

Defendant married Tanya Ruiz in 1972; she disappeared in August 1975. Although suspicion briefly focused on defendant, he was not formally charged with her death until the discovery in 1979 of the bodies of his subsequent wife Pauline and her son Tony under circumstances implicating defendant, as discussed hereafter.

Tanya, a victim of cerebral palsy and epilepsy resulting from an automobile accident, married defendant in 1972. In 1975, defendant and Tanya moved to a ranch in Southern California where defendant obtained employment. Although Tanya's doctor, Russell Shields, testified that Tanya had reported in July 1975 that she was happily married, Tanya had told her mother, Mrs. Ferreira, on several occasions during the previous year that she and defendant were not getting along, that Tanya was "scared to death" of defendant and his "terrible temper," and that she also disliked and feared defendant's mother. In addition, Tanya had remarked to her stepfather, Tony Ferreira, in April 1975, that she disliked and feared defendant's mother. Tanya was last seen at the ranch on August 6, 1975, where Tanya's grandmother, Marie Petersen had driven her after making a date for church on the following Sunday. Tanya had been visiting her grandmother the preceding three or four days.

Tanya did not meet Mrs. Petersen on Sunday as planned. A few days later, defendant called Mrs. Petersen and asked to talk to Tanya. When told that she had been left at the ranch, defendant replied: "Well, she isn't here . . . . I guess she's visiting somebody." Defendant rejected Mrs. Petersen's suggestion to call the police, saying that he did not want to start any trouble. Defendant remained silent when Mrs. Petersen opined that something must have happened to Tanya. Finally, Mrs. Petersen suggested that they drive to various places where Tanya might be staying. Defendant rejected that suggestion too. Defendant did propose that they talk to "Jim" working at a bakery in Ojai, but when Mrs. Petersen went there she was told that no one named Jim worked at the bakery. Defendant suggested no other possible leads.

Thereafter, the ranch foreman, DeJarnette, and a neighbor, Stafford, each asked defendant where Tanya was, and he replied, without elaboration, that

she had "left" defendant. Both men believed that defendant was acting nervously when discussing the matter. Tanya's pastor, Richard Smith, a Mormon bishop, confirmed that Tanya had left no forwarding address. According to Bishop Smith, if Tanya had contacted another Mormon ward anywhere in the world, and if her records were sent to her new residence, as is customary, the files would so indicate. In addition, Tanya's physician, Doctor Shields, observed that she wore a medi-alert bracelet informing that she was an epileptic regularly receiving the drug Dilantin; Shields believed that if Tanya moved anywhere, her new physician or medical facility would have contacted him and asked for her records. No such contact or request was made.

Tanya had been a Medi-Cal and Social Security recipient. Payment of these benefits continued until the time of Tanya's disappearance, when uncashed checks were returned to the government. No request was ever received from Tanya to resume these payments. Moreover, although Tanya previously had been in monthly telephonic contact with her mother, Mrs. Ferreira, those contacts abruptly ceased once Tanya disappeared. Several months after Tanya's disappearance, her mother went to the house where defendant's parents lived and went through Tanya's belongings. She found various items, including Tanya's purse (which she usually kept with her), watch, books, clothing, dishes, and a wallet containing her identification and Social Security card.

After trying for a month to locate Tanya, Mrs. Petersen reported her disappearance to the sheriff, whose deputy eventually interviewed defendant. According to the deputy, defendant seemed unconcerned about his wife's whereabouts, and told the deputy that Tanya had taken with her $150 to $200 and some clothes when she left.

The jury found defendant guilty of murder in the second degree as to Tanya.

### B. *Pauline Ruiz and Tony Mitchell*

Tanya was evidently defendant's third wife; he had divorced two previous wives. After Tanya's disappearance, defendant (who apparently failed to formally divorce Tanya) married and divorced his fourth wife; the divorce was final in August 1978. In June 1978, defendant moved into a ranch house at the Camulos Ranch near Piru, California, bringing with him his fifth wife, Pauline, and her teenage son Tony Mitchell. Sometime in October

1978, Pauline and Tony disappeared or departed. Tony stopped attending school; Pauline ceased visiting or writing friends and relatives.

In August 1978, a relative, Mathilde Cohen, talked with Tony. He told her that he was afraid of defendant, who kept guns and rifles at the house. Pauline's cousin, Rodney Cohen, testified regarding a similar conversation with Tony, who complained that he had been hit and "pushed around" by defendant; Tony also stated that he was frightened of defendant.

In October 1978, shortly before her disappearance, Pauline told Mrs. Cohen that she was having trouble with her marriage, was afraid of her mother-in-law, and was planning to move with Tony to another house in two weeks. On this same occasion, Pauline told Rodney Cohen "If you don't see me or hear from me in two weeks, I won't—I will be dead." Other witnesses confirmed that Pauline had announced her intention to move to a different location.

On another occasion in October 1978 Pauline was overheard by Christine Dexter stating that she feared for the lives of herself and her son, and that "If Tony and I, either one of us show up missing, raise hell with the police." Pauline also stated at this time that she feared both her husband and her mother-in-law. Around the same time, Pauline told witness Roxine Hann that she feared for her life, and that her mother-in-law hated her and would like to see her dead.

Pauline's and Tony's disappearance was confirmed by witnesses who testified regarding the abrupt cessation of contacts with them, including Tony's failure to attend school, and Pauline's failure to communicate with friends, relatives, or a law firm which was prosecuting a personal injury action on her behalf. Pauline left behind her car, furniture, a dog and some paintings she highly valued.

On December 14, 1978, Roxine Hann reported to police the disappearance of Pauline and Tony. The officers interviewed defendant, who stated that they had left home in mid-October driving a white vehicle, and possibly accompanied by Donna Clubb. (Pauline's car was in fact blue, and Mrs. Clubb did not own a white car.) According to defendant Pauline had indicated that she did not like living on the ranch; in the past they had argued on this subject. Defendant further explained that after leaving in the white car, Pauline returned a few days later to pick up her and Tony's clothing, a bed and some bedding.

The investigating officers contacted approximately 20 persons, and made numerous telephone calls, in an unsuccessful attempt to locate Pauline and Tony. During his investigation, Detective Pulido noted and read the 1975 missing persons report involving Tanya Ruiz. Eventually, Pulido examined an area a few feet outside the house where defendant and Pauline had lived; the ground appeared to have been dug up and cultivated. Returning with another officer, Pulido dug down about 18 to 24 inches and found two bodies, male and female.

Defendant was immediately arrested and a search of the Camulos Ranch house was conducted. Some incriminating evidence was uncovered, including a rifle which could have fired the bullet fragments found in the male victim's skull, and a rope similar in fiber content and other characteristics to the one binding the male victim's body.

An autopsy indicated that the male victim was 13 to 15 years old. Although the face was unrecognizable, Dr. Kornblum, a prosecution expert, testified that, based on dental records, he could state with reasonable medical certainty that the victim was Tony Mitchell. Kornblum observed two gunshot wounds in Tony's head. Kornblum's estimated date of death was consistent with the approximate time Tony disappeared. Similar expert testimony identified the female victim as Pauline. She had been shot once in the head, and was wearing a nightgown and knitted booties identified as Pauline's. Tony's body was wrapped in a bedsheet and blanket. Both victims probably had been shot at close range.

A firearms examiner, Cranston, testified that the bullet fragments found in Tony's skull had to have been fired by a Marlin rifle which was chambered for a .22 magnum bullet. One of the rifles found in defendant's house was a Marlin rifle having this characteristic. Ammunition found in a clip in defendant's house likewise was consistent with the fragments and slugs found in Tony's body. Cranston could not say, however, that defendant's rifle was definitely the one which had fired these slugs. A criminalist, Kotowski, testified that he performed a microscopic comparison of the rope fibers from (1) the rope binding Tony's body, and (2) the rope found in defendant's house. He concluded that the two rope samples could have originated from the same source.

The defense at the guilt phase consisted entirely of testimony of defendant's father, Alex Ruiz, that he had seen Tanya in Santa Paula after she left the ranch in the fall of 1975. According to Alex Ruiz, Tanya was seated in

the front seat of a car containing two other persons, neither of whom he recognized.

The jury found defendant guilty of murder in the first degree as to Pauline and Tony and, as previously indicated, returned a second degree murder verdict as to Tanya. The jury also found true the allegations that both Pauline's and Tony's murders were accompanied by the special circumstance of another first or second degree murder.

The People presented no penalty phase evidence. The defense established that defendant had no prior criminal convictions, that he was a loyal and polite employee, and that (according to defendant's father) he had never before acted violently toward anyone.

The jury selected the death penalty, and the trial court sentenced defendant to death. The present appeal is automatic. (§ 1239.)

## II. Contentions Affecting the Guilt Phase

### A. *Exclusion of Prospective Jurors*

Defendant contends that, for various reasons, some prospective jurors were improperly excluded from the guilt or penalty phases of his trial. These various contentions have been rejected by us in recent decisions and need not be discussed here. (See *People* v. *Frank* (1985) 38 Cal.3d 711, 734 [214 Cal.Rptr. 801, 700 P.2d 415]; *People* v. *Turner* (1984) 37 Cal.3d 302, 313-315 [208 Cal.Rptr. 196, 690 P.2d 669]; *People* v. *Zimmerman* (1984) 36 Cal.3d 154, 161 [202 Cal.Rptr. 826, 680 P.2d 776]; *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 [197 Cal.Rptr. 803, 673 P.2d 680]; see also *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

In addition, defendant argues that various prospective jurors were improperly excluded from the penalty phase in violation of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. We consider that argument below in connection with our review of the other penalty phase issues.

### B. *Denial of Severance Motion*

Defendant contends that the trial court improperly denied his motion to sever the Tanya Ruiz murder count from the remaining counts. He

argues that the evidence of Tanya's murder was "extremely weak," and that its joinder with the stronger case involving Pauline's and Tony's murders, was prejudicial error. Defendant concedes that the three murders were each "offenses of the same class" within the statutory joinder provision (§ 954). He contends, however, that the evidence relevant to Tanya's murder, on the one hand, and Pauline's and Tony's murders on the other, was not cross-admissible, and that accordingly, a severance should have been granted to avoid undue prejudice to defendant. We disagree. Although Tanya's body was never recovered, there was ample circumstantial evidence indicating that her abrupt "disappearance" in fact signaled her death, and that defendant, her husband, may have killed her. Given important similarities between the three murders, denial of severance was a matter well within the trial court's discretion.

As we recently explained, "Even where joinder is permitted by the statute, the trial court has express discretion to sever counts 'in the interest of justice.' (§ 954.) However, defendant can establish an abuse of discretion only 'on clear showing of prejudice.' [Citation.] [¶] . . . The burden of demonstrating that consolidation or denial of severance was a prejudicial abuse of discretion is upon him who asserts it; prejudice must be proved, and '[a] bald assertion of prejudice is not enough.' [Citation.]" (*People* v. *Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480]; see also *People* v. *Smallwood* (1986) 42 Cal.3d 415, 422-434 [228 Cal.Rptr. 913, 722 P.2d 197]; *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].)

The first consideration in assessing the prejudice arising from a denial of severance is *cross-admissibility*, i.e., "whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled. [Citation.]" (*Balderas, supra,* 41 Cal.3d at pp. 171-172; see *Williams, supra,* 36 Cal.3d at pp. 448-449; *People* v. *Alcala* (1984) 36 Cal.3d 604, 633 [205 Cal.Rptr. 775, 685 P.2d 1126] [admissibility of "other crimes" evidence]; *People* v. *Tassell* (1984) 36 Cal.3d 77, 88 [201 Cal.Rptr. 567, 679 P.2d 1] [same].) According to the People, there were sufficient similarities between the Tanya charges and the Pauline/Tony charges to permit such cross-admissibility, on the issue of the identity of their assailant, in separate trials. Although the question is close, we agree.

The most significant similarity between the two sets of murder charges was that both involved a wife of defendant who abruptly disappeared under suspicious circumstances indicating possible foul play, including Tanya's failure to contact her pastor, her doctor, her friends and relatives, or to

resume Medi-Cal or Social Security payments, and Pauline's failure to communicate with friends, relatives, or the law firm representing her interests. Both women left behind items of property or personal possessions (such as Tanya's purse and Pauline's car). In both cases, defendant seemed undisturbed by his wife's disappearance and uncooperative in attempts to discover her whereabouts. (In addition, both wives were overheard complaining of marital problems, including their fear of defendant and his mother. As we subsequently explain, however, this evidence was inadmissible hearsay, and we do not consider it in determining whether the court abused its discretion in denying severance.)

It is true that the prosecution's case against defendant for Tanya's murder was relatively weak, supported only by circumstantial evidence and the inferences one might draw therefrom. Indeed, defendant was not charged with that offense until the subsequent deaths were uncovered. In other words, with the discovery of Pauline's and Tony's bodies, the Tanya murder case suddenly became much stronger. But that circumstance is one favoring, rather than disfavoring, joinder of these offenses. The fact that defendant had killed Pauline was quite relevant to the question whether he had killed Tanya; indeed, Pauline's death was relevant to the critical issue whether Tanya too had died of some criminal agency. (See *People* v. *Archerd* (1970) 3 Cal.3d 615, 621, 638-639 [91 Cal.Rptr. 397, 477 P.2d 421] [evidence of three uncharged murders, including murder of defendant's wife, held admissible at his trial for murdering two other wives].)

 Even were there some doubt as to the cross-admissibility of the evidence regarding defendant's various offenses, it is clear that a court does not necessarily abuse its discretion in joining cases for trial under such circumstances, for the judge's discretion in refusing to sever a case is broader than his discretion in admitting evidence of uncharged offenses. (*Balderas, supra,* 41 Cal.3d at p. 173.) *Balderas* explained that defendant must prove a "substantial" or "clear" prejudice in order to establish an abuse of discretion arising from a failure to sever; mere lack of cross-admissibility, or the involvement of capital charges, is not enough. (41 Cal.3d at p. 173.)

 Defendant argues that a danger existed that the jury might have convicted defendant of Tanya's murder in reliance upon the evidence indicating that he killed another wife, Pauline. In other words, according to defendant, there was a danger of a "spillover" effect whereby evidentiary gaps in a weak case may be filled by joinder with a stronger case. (See *People* v. *Smallwood, supra,* 42 Cal.3d 415, 426-427; *People* v. *Williams, supra,* 36 Cal.3d 441, 453-454.)

We have already discussed the issues of cross-admissibility and the relative "weakness" of the Tanya offense. If the evidence were indeed cross-admissible, as we have concluded, then any spillover effect would have been entirely proper. Moreover, the fact that the jury found defendant guilty of only second degree murder of Tanya strongly suggests that the jury was capable of differentiating between defendant's various murders; no improper spillover effect is evident here.

As for other pertinent factors sometimes warranting a severance, here no unusually inflammatory offenses were involved (such as the child molestation or gang warfare charges alluded to in *Williams, supra,* 36 Cal.3d 441). Moreover, unlike the situation in *Williams,* joinder of the Tanya murder charge did not convert the case into a capital one, for the properly joined Pauline/Tony charges alone satisfied the multiple-murder special-circumstance statute. (Former § 190.2, subd. (c)(5).) Nor were any of these offenses "particularly brutal, repulsive, or sensational." (*Balderas, supra,* 41 Cal.3d at p. 174.)

■ Finally, defendant complains that the trial court improperly instructed the jury regarding the limited cross-admissibility of evidence of the three murders. The court instructed (based on CALJIC No. 2.50) that the evidence as to one count "may be used together with any other count . . . for certain purposes," including defendant's common plan or scheme, intent, identity or motive. The instruction further cautioned the jury that such evidence should not be considered to prove defendant's bad character or criminal disposition. Thus, the instruction was derived from section 1101, subdivision (b), of the Evidence Code and correctly admonished the jury regarding the limited extent of the cross-admissibility of the evidence in this case. Contrary to defendant's suggestion, the instruction did not permit the jury to "bootstrap" a weak case with evidence from a stronger case.

We conclude that the trial court did not abuse its discretion in denying defendant's motion to sever, and did not err in instructing on cross-admissibility.

C. *Evidence of Victims' Fear of Defendant*

■ As indicated above, the prosecutor was permitted to elicit from various acquaintances of Tanya, Pauline and Tony that they each had expressed their fear of defendant or his mother. The trial court, over defendant's objection, and in reliance upon a case which already had been abrogated by statute (*People* v. *Merkouris* (1959) 52 Cal.2d 672) [344 P.2d

1], ruled that such testimony would be admissible for the limited purposes of (1) showing the declarants' state of mind, and (2) establishing defendant's motive to kill them. The court erred in admitting such evidence. We conclude, however, that the error was not prejudicial.

■ Section 1250, subdivision (a), of the Evidence Code creates an exception to the hearsay rule for evidence of a declarant's statements regarding his or her then existing state of mind or emotion, when the *declarant's* state of mind or emotion is at issue in the case, or when the evidence is offered to prove or explain the *declarant's* acts or conduct. Under subdivision (b), however, evidence of a declarant's statement of memory or belief is not admissible as proof of the fact remembered or believed.[1] As our cases have made clear, "a victim's out-of-court statements of fear of an accused are admissible under section 1250 only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant. [Citations.]" (*People* v. *Armendariz* (1984) 37 Cal.3d 573, 586 [693 P.2d 243]; see *People* v. *Coleman* (1985) 38 Cal.3d 69, 81-86, and fn. 4 [211 Cal.Rptr. 102, 695 P.2d 189]; *People* v. *Arcega* (1982) 32 Cal.3d 504, 526-527 [186 Cal.Rptr. 94, 651 P.2d 338]; *People* v. *Green* (1980) 27 Cal.3d 1, 23-24 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Ireland* (1969) 70 Cal.2d 522, 529-532 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

In *Arcega, supra,* 32 Cal.3d 504, for example, we held that the victim's prior statements regarding her fear that defendant would "beat her up," were inadmissible because "there was no issue of fact raised by the defense with respect to [the victim's] conduct immediately preceding her death." (32 Cal.3d at p. 527.) ■ Similarly, in the present case, we can ascertain no purpose for admitting evidence of the victims' expressions of fear of defendant other than as proof that those fears were justified, and that defendant in fact killed them. In short, neither the states of mind of these victims prior to their deaths (§ 1250, subd. (a)), nor their acts or conduct (*id.,* subd. (b)), were an issue in the case which might have been resolved or assisted by the challenged evidence.

The People acknowledge the correctness of the foregoing legal principles, but they contend that the victims' statements of fear of defendant were

---

[1] Section 1250 provides in pertinent part that "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

properly admitted. With respect to Pauline and Tony, the People theorize that, because both victims were found in bed clothes, wrapped in bedding material, and apparently shot at close range in the back of their heads, defendant evidently waited until they slept to kill them ("lying-in-wait"). Thus, according to the People, the victims' prior fears were relevant to show why defendant needed to catch them "off guard." But as we observed above, victims' statements regarding their fear of the accused are simply not admissible to explain *his* conduct (i.e., to prove guilt). Pauline's and Tony's fear of defendant was neither an issue in the case nor helpful in explaining *their* acts or conduct prior to their deaths.

As for Tanya, the People suggest only that her fears reflected a "faltering" marriage, thereby providing defendant with a motive for killing her. Again, a victim's prior statements of fear are not admissible to prove *the defendant's* conduct or motive (state of mind). If the rule were otherwise, such statements of prior fear or friction could be routinely admitted to show that the defendant had a motive to injure or kill. (We note that Tanya's expressions of fear of defendant would not have been very probative of whether or not she was truly dead. Her fear of defendant could as readily suggest that she left him before he could hurt her.)

The trial court, at the urging of the district attorney, relied on People v. *Merkouris, supra,* 52 Cal.2d 672, which had held that a victim's fear of the defendant was relevant to show that he had engaged in threatening conduct, and had later carried out those threats. As noted in *Armendariz,* however (37 Cal.3d at p. 588, fn. 15), the legislative comment to section 1250 of the Evidence Code, adopted in 1965, made it clear that *Merkouris* had been "repudiated" by the new section "because the [*Merkouris*] doctrine undermines the hearsay rule itself. . . . The exception created by *Merkouris* is not based on any probability of reliability; it is based on a rationale that destroys the very foundation of the hearsay rule." Unfortunately, neither the trial court nor trial counsel herein realized that *Merkouris* had been legislatively abrogated.

■ Thus, we conclude that the trial court erred in admitting the testimony regarding the victims' expressions of fear of defendant. We also conclude, however, that any such error was harmless. First, such evidence was admitted on a limited basis only; the jury was told on several occasions that they should consider testimony regarding the victims' fear of defendant only to show the declarants' state of mind, and their relationship with defendant, and not to prove the truth of the matters expressed by the victims. At close of trial, the court also reminded the jury that it must not consider such evidence for any purpose other than the limited one for which

it was admitted. Thus, it would be reasonable to conclude that the jury realized that, although evidence had been admitted indicating that the victims at one time or another expressed their fear of defendant, the jury should not draw any inference that such fears were justified or that defendant was guilty of harming them.

We also observe that, unlike prior cases which had reversed convictions for similar errors, here defendant elected to mount no defense and merely argued the insufficiency of the prosecutor's case. We conclude that, although the evidence of defendant's guilt of these murders was essentially circumstantial, and the evidence regarding Tanya's death and defendant's complicity therein was somewhat weak standing alone, nonetheless in light of all the evidence, including the substantial, cross-admissible evidence of Pauline's and Tony's murders, it is not reasonably probable that the jury's guilt verdict would have been different had the jury not been told of the victims' fear of defendant. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. Defendant cites no apposite authority, and we have found none, for the proposition that a more stringent error standard than *Watson* applies where hearsay evidence has been improperly admitted.)

As for the effect of the error on the jury's *penalty* decision, we conclude that, under any review standard, the error was harmless. In light of the jury's determination that defendant had murdered each of his victims, evidence of their prior expressions of fear of him could have added very little, if anything, to the jury's decision regarding the appropriate penalty.

D. *Sufficiency of Evidence of Tanya's Murder*

Defendant next challenges the sufficiency of the evidence of Tanya's murder. He first suggests that, in view of the paucity of evidence of Tanya's *death,* the prosecutor failed even to establish the corpus delicti of the crime. We disagree. ■ The corpus delicti "may be [proved] by circumstantial evidence [citation], and it need not be beyond a reasonable doubt. A slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient. [Citations.]" (*People* v. *Alcala, supra,* 36 Cal.3d at pp. 624-625.) It is unnecessary to establish that the defendant committed the offense, as long as the evidence indicates that an offense has occurred. (*In re Robert P.* (1981) 121 Cal.App.3d 36, 38-39 [175 Cal.Rptr. 252].)

■ In the present case, there was ample circumstantial evidence of Tanya's death by foul play, including her abrupt disappearance, her failure to contact friends, relatives, her physician and her pastor, her failure to seek

resumption of Medi-Cal and Social Security payments, and her abandonment of several personal effects, including her purse. Because her body was never found, a reasonable inference of criminal agency could arise. ■ As we have stated, "the corpus delicti rule is satisfied 'by the introduction of evidence which creates a reasonable inference that death could have been caused by a criminal agency . . . even in the presence of an equally plausible noncriminal explanation of the event.' [Citation.]" (*People v. Towler* (1982) 31 Cal.3d 105, 117 [181 Cal.Rptr. 391, 641 P.2d 1253].)

The more difficult question is whether there was substantial evidence to support defendant's conviction of murdering Tanya. Our role as an appellate court is clear. ■ We must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see *People v. Towler, supra,* 31 Cal.3d at pp. 117-118.) As *Towler* explains, "even though the appellate court may itself believe that the circumstantial evidence might be reasonably reconciled with defendant's innocence, this alone does not warrant interference with the determination of the trier of fact. [Citations.] Whether the evidence presented is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.]" (*Id.* at pp. 118-119.)

■ Here, a close question exists whether substantial evidence existed to support defendant's conviction, if we discount or ignore evidence of Tanya's statements regarding her fear of defendant. But in addition to the evidence of Tanya's mysterious and abrupt disappearance, and the reasonable inference that she may have died as a result of foul play, the jury was also entitled to consider (1) the fact that defendant failed formally to divorce Tanya before marrying his fourth wife, and (2) the cross-admissible evidence indicating that three years later defendant killed another wife and her son who vanished under similar mysterious circumstances. A reasonable trier of fact could have concluded, on the basis of all of the evidence in the case, including defendant's role in slaying Pauline and Tony, that he likewise killed Tanya and buried or otherwise concealed her body.

### E. *Doctor Shields's Testimony*

As we have noted, the evidence indicated that Tanya had been seeing Doctor Shields with respect to her epilepsy; she was prescribed a daily

dosage of Dilantin, an antiseizure medication. Shields testified that Tanya had become "totally" dependent upon him as a "father figure" to whom she could confide medical and personal problems. According to Shields, it was customary, indeed "almost mandatory," for a patient such as Tanya to request a transfer of medical records if the patient had changed doctors, and that he had received no such request. The prosecutor then asked Shields whether he had an opinion "as to whether she would have contacted you after July of 1975 if she was still alive?" Defense counsel objected to the question as "irrelevant," which objection was overruled.

Shields then responded that in his professional opinion, "either she or some medical facility would have contacted me within, I would estimate, four months or five months of the time that I last saw her and refilled her medication because by clinical history Tanya seizured. She actually manifested full grand mal-type seizures and either they—she herself would have requested additional refills of her medication or a medical facility somewhere would have contacted me . . . ."

 Defendant now argues that Doctor Shields's testimony was improper as expert testimony because it expressed an opinion on a matter not sufficiently beyond common experience (see Evid. Code, § 801, subd. (a); *In re Hernandez* (1977) 70 Cal.App.3d 271, 280-281 [138 Cal.Rptr. 675]), and was not based on information of a type reasonably relied on by an expert in forming his opinions (Evid. Code, § 801, subd. (b)). Specifically, defendant challenges the use of Dr. Shields's testimony to support the theory that Tanya was dead. But he was never asked whether, in his opinion, Tanya was dead. Instead, he was asked whether, based on his knowledge of Tanya and her medical problems, he believed she would have contacted him after July 1975 if she were alive. His response—that either Tanya or a medical facility would have contacted him—seems unobjectionable based on his personal knowledge and close relationship with her. Only an expert with his particular credentials could have spoken on this subject. Moreover, trial counsel's objection based on lack of relevance was not well taken in any event. Testimony as to whether or not a patient such as Tanya would have requested her medical records in the event she moved elsewhere was clearly relevant to the issue of Tanya's death or disappearance.

F. *Victims' Photographs*

Defendant next contends that the trial court erred in admitting photographs of the bodies of victims Pauline and Tony. The issue had been raised pretrial when defendant moved to exclude them under Evidence Code section 352 because their prejudicial effect outweighed their probative value.

The court examined the photos, heard extensive argument on the matter, and denied the motion. The court observed that such demonstrative evidence "avoids the problem of recollection and verbal articulation and description of physical objects." While acknowledging the unpleasant nature of some of them, the court observed that because of the absence of blood, they were less gruesome than many homicide photos.

Some of these photographs displayed the bodies at the gravesite, wrapped in a distinctive sheet of a kind found in the victims' house. Other photos showed sets of the victims' teeth (one basis for identifying them). According to the prosecutor, the victims' photos were more like "mummies in a museum" than homicide victims.

The trial court concluded that although the photos were "perhaps" prejudicial, there was nonetheless significant probative value to each of them. Accordingly, the court overruled defendant's objection, but ruled that defense counsel would be permitted to show the photos to prospective jurors on voir dire, to determine whether the jurors could fairly sit despite being exposed to such evidence. The record indicates that defense counsel routinely used the photos on voir dire, a technique which undoubtedly helped inure the jury to their unpleasant nature.

We have held that the admission of photographs of victims lies within the trial court's discretion unless their probative value is clearly outweighed by their prejudicial effect. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 54 [222 Cal.Rptr. 127, 711 P.2d 423].) Here, many of the photos were relevant to the issues of identity, nature of wounds and means of concealing the bodies. Moreover, assuming error occurred, the subject matter was not so objectionable as to be clearly prejudicial to defendant, especially in light of trial counsel's extensive "preview" of the photos during voir dire.

G. *Lying-in-wait Instructions*

Defendant next contends that the instructions regarding murder by lying-in-wait were defective, and that in any event the evidence was insufficient to support a lying-in-wait theory. Neither point has merit.

With respect to the counts accusing defendant of murdering Pauline and Tony, the prosecutor proceeded on alternative theories of deliberate and

premeditated murder, and murder by lying-in-wait (see § 189).[2] The standard lying-in-wait instruction (CALJIC No. 8.25)[3] was given, calling for proof of a "waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise." The instruction also explained that "The lying-in-wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation *or* deliberation." (Italics added.) Finally, the instruction required proof of intentional infliction of bodily harm likely to result in death.

Defendant first contends that we should reexamine the "archaic" concept of lying-in-wait and hold that premeditation, deliberation and intent to kill must be independently proved. (See Perkins, Criminal Law (2d ed. 1969) pp. 90-91.) ▮ But proof of lying-in-wait, as outlined in CALJIC No. 8.25, acts as the functional equivalent of proof of premeditation, deliberation and intent to kill. (See *People* v. *Byrd* (1954) 42 Cal.2d 200, 208 [266 P.2d 505] ["If the killing was committed by lying in wait, it was murder of the first degree by force of the statute . . . and the question of premeditation was not further involved"]; *People* v. *Ward* (1972) 27 Cal.App.3d 218, 231 [103 Cal.Rptr. 671] ["Such conduct . . . take[s] the place of direct proof" of premeditation and deliberation]; *People* v. *McNeal* (1958) 160 Cal.App.2d 446, 450-451 [325 P.2d 166] and cases cited; cf. *People* v. *Wiley* (1976) 18 Cal.3d 162, 168-169 [133 Cal.Rptr. 135, 554 P.2d 881] [torture murder deemed "equated to . . . premeditation and deliberation"].) In view of the foregoing uniform interpretation of the lying-in-wait provision in section 189, imposition of a requirement of independent proof of premeditation, deliberation or intent to kill would be a matter for legislative consideration.

▮ Defendant also suggests that CALJIC No. 8.25 is flawed in not requiring a state of mind equivalent to premeditation *and* deliberation; he

---

[2] This section provides in pertinent part: "All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree."

[3] "Murder which is immediately preceded by lying-in-wait is murder of the first degree. [¶] The term lying-in-wait is defined as waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying-in-wait need not continue for any particular period of time provided that *its duration is such as to show a state of mind equivalent to premeditation or deliberation.* To constitute murder by means of lying-in-wait there must be, in addition to the aforesaid conduct by the defendant, an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life."

observes that the instruction is phrased in the disjunctive. We think it unlikely the phrasing could have misled the jury, which in a separate instruction was correctly told that a wilful, deliberate *and* premeditated killing with malice aforethought is murder of the first degree. Moreover, the Legislature in adopting the lying-in-wait provision only required that the defendant be shown to have exhibited a state of mind which is "equivalent to," and not identical to, premeditation or deliberation. Thus, the disjunctive phraseology in CALJIC No. 8.25 was neither inappropriate nor misleading.

Finally, defendant contends that there was insufficient evidence to support a lying-in-wait theory. According to defendant, no direct evidence was introduced regarding the fatal encounter between defendant and victims Pauline and Tony; no evidence was admitted indicating a secret or concealed watchful waiting of the sort required by the statute. (See also *People* v. *Merkouris* (1956) 46 Cal.2d 540, 559 [297 P.2d 999]; *Richards* v. *Superior Court* (1983) 146 Cal.App.3d 306, 315-316 [194 Cal.Rptr. 120].)

The People submit the following evidence in support of the instruction: The victims' bodies were clothed in bedclothes and wrapped in bedding, and each victim was shot at close range in the back of the head. From such evidence, the jury reasonably could infer that defendant watched and waited until his victims were sleeping and helpless before executing them.

The case is similar to *People* v. *McDermand* (1984) 162 Cal.App.3d 770, 786-788 [211 Cal.Rptr. 773], where defendant apparently killed his mother and brother as they lay sleeping. Mrs. McDermand's body was found in bed beneath a blanket; she had been shot behind her ear. The court, upholding a lying-in-wait verdict, observed that the foregoing evidence "suggest[ed] that defendant waited until she was asleep in order to take′ her totally unawares." (P. 787.) Although the verdict was also supported by defendant's own admissions, the court observed that the evidence independent of those admissions adequately supported the lying-in-wait finding. (Pp. 798-799.) We conclude that there was sufficient evidence to support the giving of lying-in-wait instructions in the present case.

H. *Motion to Sequester Jury*

Prior to trial defense counsel, citing certain local news articles regarding the case, moved to sequester the jury. The motion was renewed at the close of the guilt and penalty phases. Both motions were denied.

The articles in question discussed some matters later excluded from trial, namely, alleged voodoo practices by defendant's mother. The article indicated that Pauline had described her stepmother as "an authentic witch" and that Pauline feared her stepmother was practicing voodoo on her. Defense counsel also cited certain news articles about the unrelated Theodore Frank capital case, which counsel believed might adversely affect the jury.

Although the trial court denied defendant's motions to sequester, certain precautionary measures were taken. The trial court admonished the jurors not to read newspaper articles regarding the case and, prior to the penalty trial, the court allowed defense counsel to reopen voir dire in order to determine whether the jurors had read any news accounts about other capital cases. One juror had a "vague" recollection of an article about the Frank case; the other jurors replied negatively. The trial court thereupon further admonished the jury not to base its verdict on anything but the evidence and instructions, nor to discuss or read about the case. (§ 1122.)

The decision whether to sequester a jury is a discretionary one. (§ 1121 [jurors "may, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer"]; see *People* v. *Chain* (1971) 22 Cal.App.3d 493, 497 [99 Cal.Rptr. 472]; *People* v. *Murphy* (1973) 35 Cal.App.3d 905, 933 [111 Cal.Rptr. 295].) The trial court stands in the best position to evaluate the necessity of sequestration in a particular case, and no abuse of discretion appears here. (See *People* v. *Manson* (1977) 71 Cal.App.3d 1, 27 [139 Cal.Rptr. 275].)

Defendant argues, however, that sequestration "should be the rule, rather than the exception, in capital cases," where pretrial publicity is likely to be more extensive and inflammatory. We disagree. First, defendant has failed to demonstrate that the publicity in the present case was either extensive or unduly prejudicial to his defense; it is noteworthy that defendant did not choose to move for a change of venue. Defendant acknowledges that the California cases appear to require some showing of actual prejudice in order to complain of denial of a motion to sequester the jury. (E.g., *People* v. *Murphy, supra,* 35 Cal.App.3d at p. 933; *People* v. *Myers* (1968) 262 Cal.App.2d 307, 312 [68 Cal.Rptr. 636].)

Second, section 1121 by its terms would not permit an absolute rule requiring sequestration in every capital case, and we discern no overriding constitutional principle which would compel such a holding. Cases from sister states cited by defendant involved different statutory or common law

procedures. (See, e.g., *Lowery* v. *State* (Ind. 1982) 434 N.E.2d 868, 870 [Indiana rule requiring sequestration in death cases].) Several such cases applied principles governing motions for venue change. (See, e.g., *State* v. *Cunningham* (1979) 23 Wash.App. 826 [598 P.2d 756, 764].) Were we to apply such principles in a postjudgment attack upon the court's refusal to sequester the jury, we probably would conclude that the reopened voir dire examination, exploring the effect of outside news articles on the jury, adequately "demonstrate[d] that pretrial publicity had no prejudicial effect." (*People* v. *Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240].)

■ In a related contention, defendant complains of the trial court's decision to conduct the jury trial only three and one-half days each week, rather than a full five-day week as requested by defendant. According to defendant, if the jurors had spent more time in trial, they would have had less potential exposure to prejudicial publicity. But as previously noted, each juror was carefully admonished to avoid news accounts regarding the case, and we cannot assume on a silent record that they ignored that admonition and were exposed to prejudicial material.

Although defendant (and the People) had a right to an "expeditious disposition" of the case (see § 1050), the failure to conduct a full, five-day-week trial would not warrant reversal of the judgment. (Cf. *People* v. *Carlson* (1977) 76 Cal.App.3d 112, 115 [142 Cal.Rptr. 638] [former § 1050 merely stated a "policy" which courts should attempt to follow].) Here, the trial judge had the separate administrative responsibility of managing a law and motion calendar, requiring him to reserve a day and a half each week. Certainly, the present situation was not analogous to calling a three-week continuance of trial at the close of the People's case to permit the trial judge to perform other judicial duties. (See *People* v. *Engleman* (1981) 116 Cal.App.3d Supp. 14, 20-21 [172 Cal.Rptr. 474].)

### III. CONTENTIONS AFFECTING THE PENALTY PHASE

#### A. *Exclusion of Prospective Jurors*

■ Defendant contends that various prospective jurors were improperly excluded from the jury in violation of *Witherspoon* v. *Illinois, supra,* 391 U.S. 510. The review standard cited by defendant has been substantially modified by the United States Supreme Court in *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], a modification recently adopted by our court in *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239

Cal.Rptr. 82, 739 P.2d 1250]. *Witt* adopted a new review standard, namely, whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." In addition to dispensing with *Witherspoon's* reference to "automatic" decisionmaking, this new standard likewise does not require that a juror's bias be proved with "unmistakable clarity." (469 U.S. at p. 424 [83 L.Ed.2d at p. 852].)

Because we believed that *Witt's* review standard and underlying rationale made good sense, and because California courts have generally followed the teachings of the high court in determining when a prospective juror properly may be excused for cause because of his views regarding capital punishment, we adopted the *Witt* standard in *Ghent, supra,* 43 Cal.3d 739. As will appear, however, even under the more strict *Witherspoon* test, *supra,* 391 U.S. 510, none of the prospective jurors was improperly excused for cause in the present case.

Our review of the record discloses that although several such jurors made somewhat equivocal responses to the *Witherspoon* inquiry, each of them ultimately confirmed that they could not vote for death *under any circumstances*. As we recently explained, where equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court. (*People* v. *Fields, supra,* 35 Cal.3d at pp. 355-356; accord, *People* v. *Floyd* (1970) 1 Cal.3d 694, 725 [83 Cal.Rptr. 608, 464 P.2d 64]; see also *Wainwright* v. *Witt, supra,* 469 U.S. at pp. 428-430 [83 L.Ed.2d at pp. 854-856].) We conclude that each of the prospective jurors was properly challenged for cause.

■ Defendant also contends that the trial court improperly *retained* on the jury panel four prospective jurors who expressed a preference, in some cases at least, for imposition of the death penalty over life imprisonment without parole. Once again, although some of these prospective jurors indicated such a preference at one point in their voir dire examination, each of them ultimately confirmed that he or she would follow the court's instructions and would consider life imprisonment as an appropriate alternative to the death penalty.

We have held that "The entertaining of an immutably established opinion in favor of invariably selecting the death penalty . . . is such a 'state of mind . . . which will prevent [the juror] from acting with entire impartiality and without prejudice. . . .'" (*People* v. *Hughes* (1961) 57 Cal.2d 89, 95

[17 Cal.Rptr. 617, 367 P.2d 33]; see also *People* v. *Pike* (1962) 58 Cal.2d 70, 86-87 [22 Cal.Rptr. 664, 372 P.2d 656]; §§ 1073, 1074.) But, as previously explained, we have also held that a trial court's determination of a juror's impartiality, where conflicting responses are elicited on voir dire, is binding upon us. (*People* v. *Fields, supra,* 35 Cal.3d at p. 356.) Our review of the record convinces us that the trial court did not abuse its discretion when it refused to exclude these four prospective jurors for cause.

### B. *Instructing on Inapplicable Statutory Factors*

 Defendant contends that the trial court erred in reading to the penalty phase jury the entire statutory list of aggravating and mitigating factors, including some factors which were inapplicable to the case. The court explained to the jurors that they might consider these various factors "if applicable." Defendant now contends that this procedure was improper, and that if the 1977 death penalty law allowed it, that law was unconstitutional.

Former section 190.3 provided that "In determining the penalty the trier of fact shall take into account any of the following factors *if relevant* . . . ." There followed a list of the various aggravating and mitigating circumstances, several of which are prefaced by the phrase "whether or not." (For example, subdivision (c) asked the trier of fact to take into account "*Whether or not* the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." [Italics added.])

As seems apparent from the language of former section 190.3, the jury must be instructed regarding the entire statutory list of sentencing factors in order to determine whether or not each factor is applicable ("relevant"). As we have held, the "deletion of any potentially mitigating factors from the statutory list could substantially prejudice the defendant. We believe that the jury is capable of deciding for itself which factors are 'applicable' in a particular case. The present instruction [CALJIC No. 8.84.1] is adequate for that purpose." (*People* v. *Ghent, supra,* 43 Cal.3d 739, 776-777; cf. *People* v. *Jackson* (1980) 28 Cal.3d 264, 316 [168 Cal.Rptr. 603, 618 P.2d 149].)

As *Jackson* explained, the provision at issue is not constitutionally infirm for failing to explain to the jury which of the listed factors are aggravating, and which are mitigating, for the nature of these various factors "should be self-evident to any reasonable person within the context of each particular case." (*Ibid.*) Similarly, we see no constitutional defect in placing on the

shoulders of the trier of fact the task of determining whether or not a particular statutory factor is applicable in the present case.

### C. Prosecutorial Argument Regarding Absence of Mitigating Factors

 Defendant next argues that the prosecutor committed misconduct in commenting on the absence or irrelevance of some of the statutory sentencing factors. As we held in *People* v. *Ghent, supra,* "No good reason appears for depriving the prosecutor of the opportunity to argue that certain otherwise mitigating factors are not present in the case." (43 Cal.3d at p. 775; see also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 789-790 [230 Cal.Rptr. 667, 726 P.2d 113].) Our review of the record fails to indicate that the prosecutor actually argued that the absence of a mitigating factor would itself constitute an aggravating factor relevant to the jury's penalty determination. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].) The prosecutor simply observed in his jury argument that many of the statutory mitigating factors were inapplicable to this case. This is not an unfair or improper technique, given defense counsel's opportunity to assert appropriate contrary argument and analysis.

### D. Charging Two Multiple-murder Special Circumstances

 Defendant complains that he was charged with *two* multiple-murder special circumstances (former § 190.2, subd. (c)(5)). (The count charging defendant with murdering Pauline included a multiple-murder special circumstance which cited "another" murder in the first or second degree, and the count charging Tony's murder included a similar special circumstance.) Defendant correctly observes that the "appropriate procedure" is to charge only one multiple-murder special circumstance where more than one victim is involved. (See *People* v. *Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433] [plur. opn.].) The present case was tried before *Harris* was decided, however, and any error in failing to anticipate our ruling in that case clearly would be harmless. Neither the trial court nor the prosecutor suggested to the jury that the existence of the additional special circumstance finding somehow could affect or aggravate the penalty. (See also *Harris* v. *Pulley* (9th Cir. 1982) 692 F.2d 1189, overruled on other grounds, *Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871].)

Moreover, there is little potential impact upon a jury from duplicative multiple-murder special circumstances. Here, the jurors were well aware of the actual number of victims, and nothing in the manner in which this case

was tried, or in the penalty phase argument and instructions, affords a basis on which to speculate that the jury may have been influenced by the number of multiple-murder special-circumstance findings.

E. *Exclusion of Reverend Jiroch's Testimony*

At the penalty phase, defendant called a minister, Reverend Jiroch, who had counseled jail inmates for six years. (He previously had been a marriage and family counselor.) After Jiroch testified regarding his work experience and once-a-week visits with defendant, defense counsel asked Jiroch if he thought defendant would lead "a moral and religious life" in prison were he sentenced to life without parole. The prosecutor objected on the basis of lack of relevance or adequate foundation. The trial court sustained the objection because, among other grounds, allowing evidence of the likelihood that a particular defendant could reform and become a "model prisoner" would be akin to "opening Pandora's box."

Although the range of admissible mitigating evidence is necessarily very broad, it is not unlimited. "Evidence presented at the penalty phase should focus on 'the character and record of the individual offender and the circumstances of the particular offense.' [Citations.]" (*People v. Harris, supra,* 28 Cal.3d at p. 962 [upholding exclusion of evidence regarding mechanics of executing the death penalty].) We have previously observed that attempts by psychological experts to predict the future dangerousness of a capital defendant are both unreliable and of doubtful relevance to the jury's penalty determination. (*People v. Murtishaw* (1981) 29 Cal.3d 733, 767 [175 Cal.Rptr. 738, 631 P.2d 446].) Similarly, any attempt by a religious counselor to predict whether defendant will lead a "moral" life in prison seems equally objectionable, especially where he was not shown to possess the academic credentials or experience necessary to make such a difficult assessment. Thus, the trial court properly excluded Jiroch's testimony as lacking adequate foundation. (Cf. *People v. Coleman* (1969) 71 Cal.2d 1159, 1167 [80 Cal.Rptr. 920, 459 P.2d 248] [pastor lacked sufficient knowledge of defendant's potential for rehabilitation].)

Nor was the trial court's ruling a violation of *Skipper v. South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669]. *Skipper* deemed it reversible error to exclude lay testimony regarding a capital defendant's good behavior while he was a jail inmate awaiting trial. Significantly, the high court observed that the lay witnesses were not asked to predict defendant's *future* behavior but simply to confirm that he had adjusted well to jail conditions, a proper mitigating factor to be considered in deciding penalty.

(*Id.*, at p. __ [90 L.Ed.2d at pp. 5-6, 106 S.Ct. at p. 1672].) Accordingly, their testimony could not be excluded for lack of a proper foundation.

Finally, any error in excluding the proffered testimony was clearly harmless. Jiroch was permitted to testify that he had discussed religious and Christian principles with defendant, who had expressed a desire to attend Oral Roberts University and obtain a master's degree in theology. Given such testimony, the jury readily could infer that Jiroch would confirm defendant's ability to lead a "moral and religious life" in prison.

### F. *Prosecutor's Reference to Lack of Remorse*

During his penalty phase closing arguments, the prosecutor commented upon defendant's apparent lack of remorse for his killings. Defendant contends that lack of remorse is not a proper aggravating factor under former section 190.3.

Defendant failed to object to the prosecutor's comments or to request an appropriate admonition; accordingly, he waived the objection on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.) In any event, as we held in *People* v. *Ghent, supra,* 43 Cal.3d at page 771, "The concept of remorse for past offenses as a mitigating factor sometimes warranting less severe punishment or condemnation is universal," and accordingly the prosecutor is permitted to observe the absence of that particular mitigating factor.

### G. *Absence of 1978 Law Instructions*

The trial court determined, without objection from defendant, that the case would be tried under the 1977 death penalty law because the offenses each occurred prior to the effective date of the 1978 law. Defendant now contends that he was entitled to any "ameliorative" changes in the new law, including its provision that mandates a life without parole sentence when the mitigating circumstances outweigh the aggravating ones. (§ 190.3.)

The point lacks merit. (See *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 783-784.) As we concluded in *Rodriguez,* it is inconceivable that a jury would reach a different verdict had it been instructed under the 1978 law, and thus any supposed benefit arising from an instruction modeled on the new law would be " 'more theoretical than real.' " (Quoting from *People* v. *Easley* (1983) 34 Cal.3d 858, 884, fn. 18 [196 Cal.Rptr. 309, 671 P.2d 813].)

### H. *Inadequate Instructions on Background, Character and "Sympathy" as Mitigating Factors*

The penalty jury was instructed, with some modifications, in the words of former section 190.3, subdivision (j), that in determining penalty, the jury should consider, take into account, and be guided by, "although not limited to," the statutory list of aggravating and mitigating factors, including "Any other circumstance which *mitigates* the gravity of the crime even though it is not a legal excuse for the crime." (Italics added.) Thus, the court modified the statutory language by explaining that the jury was "not limited to" the statutory list of factors, and could consider any other circumstance which "mitigates" (instead of "extenuates") the offense.

Defendant contends that despite the trial court's modifications, the instruction was inadequate without additional clarifying instructions which explained the broad scope of the jury's sentencing discretion, including the propriety of such mitigating factors as the defendant's character and background.

We considered a similar claim in *People* v. *Ghent, supra,* 43 Cal.3d at page 777, wherein we observed that, by reason of a recent opinion of the United States Supreme Court, we must review the record in each case to determine whether the jury instructions, taken as a whole, and read in conjunction with the prosecutor's arguments, adequately informed the jury of its responsibility to consider all of the mitigating evidence in the case. (See *California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837] (conc. opn. by O'Connor, J.), 561 [93 L.Ed.2d at p. 952] (dis. opn. by Brennan, J.), 563 [93 L.Ed.2d at p. 953] (dis. opn. by Blackmun, J.) We have undertaken such a review in the present case, and we conclude that there exists "no legitimate basis" (see opn. of O'Connor, J., *id*. at p. 546 [93 L.Ed.2d at p. 943]) for believing that the jury was misled regarding the scope of the evidence to be considered in its sentencing determination.

The trial judge had originally instructed the jury in the language of former section 190.3, listing the various statutory factors relevant to the penalty determination. At defense counsel's urging, however, the court specially reinstructed the jury that its determination was "not limited to" these specific factors. The prosecutor, reviewing the evidence during his closing arguments, asked the jury: "Do the factors . . . that you are instructed on, *although not limited to,* which way do they point?" (Italics added.)

Thereafter, defense counsel elaborated upon the matter in his own closing arguments, explaining that the penalty decision was "a moral decision for each and every one of you, and no combination of factors, even those ten factors. There is no combination of other factors under the law that requires you to vote for the death penalty. . . ."

Finally, the trial court specifically instructed the jury that, in determining penalty, "you shall consider *all of the evidence* which has been received during any part of the trial of this case." We conclude that the jury was adequately instructed regarding the scope of its sentencing discretion, and that it must have understood that it could consider the testimony regarding defendant's character and background given by his friends and relatives at the penalty phase in deciding the appropriate penalty.

I. *Carryover of Guilt Phase Instruction to Disregard Sympathy*

At the conclusion of the *guilt* phase, the trial court properly instructed the jury not to be swayed by such sentiments as mere sympathy, passion or prejudice. The jury was never affirmatively told at the *penalty* phase that sympathy for defendant would be a proper consideration in determining the penalty.

Our prior cases had held that an instruction at the penalty phase not to be influenced by sympathy for the defendant is erroneous and is generally ground for reversal of a verdict imposing the death penalty (*People* v. *Lanphear* (1984) 36 Cal.3d 163, 168-169 [203 Cal.Rptr. 122, 680 P.2d 1081]; *Easley, supra,* 34 Cal.3d at p. 875), because of a substantial likelihood that the jury might have felt compelled to reject what is usually an important element of the penalty defense. The decision in *California* v. *Brown, supra,* 479 U.S. __ [93 L.Ed.2d 934], explains, however, that the giving of such an instruction is not reversible per se, but requires a review of the record in each case to determine whether or not the jury was misled concerning its sentencing responsibilities.

■ In any event, as pointed out in *People* v. *Rodriguez, supra,* 42 Cal.3d at page 785, "The situation is otherwise when, as here, the no-sympathy instruction occurs only at the guilt phase. The potential for confusion, while it exists theoretically, is more attenuated. We must therefore examine the record as a whole to determine whether an abstract possibility of prejudice may actually have been realized. [Citation.]" (See *People* v. *Miranda* (1987) 44 Cal.3d 57 [241 Cal.Rptr. 594, 744 P.2d 1127], finding no improper carryover of an antisympathy guilt phase instruction.)

■ In the present case, as indicated previously, defendant called various friends and relatives to testify regarding his background and character. The prosecutor made no attempt to argue that the jury must disregard such testimony in making its penalty determination, and defense counsel relied on such evidence in making his argument that defendant should be spared, stating: "He has children. He has loved ones. He is a human being and to impose the death penalty, in my opinion, is just to deny humanity." As in *Miranda, supra,* 44 Cal.3d at page 102, we conclude that the court did not err in failing to give additional clarifying instructions on the subject of sympathy.

### J. *Unconstitutionality of 1977 Death Penalty Law*

Defendant repeats various constitutional arguments previously considered and rejected by us in prior cases, including the lack of adequate sentencing standards, written findings, jury unanimity regarding aggravating factors, or a system of proportionality review. (See *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 315-317; *People* v. *Frierson* (1979) 25 Cal.3d 142, 172-188 [158 Cal.Rptr. 281, 599 P.2d 587]; cf. *Pulley* v. *Harris, supra,* 465 U.S. at pp. 53-54 [79 L.Ed.2d at pp. 42-43].) We do not reconsider those arguments here.

### K. *Application for Modification of Sentence*

■ Finally, defendant contends that the trial court failed to give "due consideration" to the mitigating evidence and applied an incorrect standard of review in ruling on defendant's automatic application for modification of the death penalty. (See former § 190.4, subd. (e).) Although the trial court did not expressly *mention* the mitigating evidence referred to by defendant, there is no indication in the record that the court ignored or overlooked such evidence. Moreover, the record does not indicate that the court misapplied the proper review standard when it found that the aggravating factors overwhelmingly outweighed the mitigating ones in this case. The record suggests that the court properly and independently discharged its statutory responsibility to review the evidence in making its penalty determination.

The judgment is affirmed.

Mosk, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in the affirmance of the first degree murder convictions of defendant for the killing of Pauline Ruiz and her son, Tony,

and of the finding of the special circumstance of multiple murder. I dissent from the affirmance of the second degree murder conviction for the killing of Tanya Ruiz and from the affirmance of the death penalty.

The majority and the trial court incorrectly conclude that the evidence as to the killing of Pauline and Tony was admissible in considering the Tanya charge. The trial court's conclusion led to errors in denying a motion for severance and in instructing the jury. Based on their incorrect conclusion, the majority reject the claims of error. The trial court also erred in admitting evidence that Tanya had said that she feared defendant. The majority recognize this error. When we exclude from consideration on the Tanya count the evidence with respect to Pauline and Tony and the fear evidence, the evidence is insufficient to support the findings of guilt on the Tanya charge.

Because the evidence on the Tanya count was so weak, the errors require reversal of the jury finding that defendant murdered Tanya. That finding is critical to the jury's decision to impose the death penalty for the other murders, and the errors in the guilt trial as to Tanya not only require reversal of defendant's conviction for her murder but also require reversal of the death penalty.

## I. CROSS-ADMISSIBILITY

The majority conclude that there were sufficient "similarities" between the Tanya charges and the Pauline and Tony charges to permit cross-admissibility of the evidence in separate trials. (Maj. opn., *ante.*, p. 605.) The majority have ignored the settled rules in this state governing the admissibility of evidence of other crimes.

The general rule is that evidence of other crimes is inadmissible when it is offered solely to prove criminal disposition or propensity on the part of the accused to commit the crime charged, because the probative value of the evidence is outweighed by its prejudicial effect. (E.g., *People* v. *Haston* (1968) 69 Cal.2d 233, 244 [70 Cal.Rptr. 419, 444 P.2d 91].) The general rule is codified in Evidence Code section 1101, subdivision (a).

"The rule excluding evidence of criminal propensity is nearly three centuries old in the common law. (1 Wigmore, Evidence (3d ed. 1940) § 194, pp. 646-647.) Such evidence 'is [deemed] objectionable, not because it has no appreciable value, *but because it has too much.*' (Italics added.) Inevitably, it tempts 'the tribunal . . . to give excessive weight to the vicious

record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.' (*Id.* at p. 646; quoted in *People* v. *Schader* (1969) 71 Cal.2d 761, 773, fn. 6 [80 Cal.Rptr. 1, 457 P.2d 841].)" (*People* v. *Alcala* (1984) 36 Cal.3d 604, 630-631 [205 Cal.Rptr. 775, 685 P.2d 1126].) Because of the sound reasons behind the general rule of exclusion, the relevancy of evidence of other crimes and therefore its admissibility must be examined with care and received with "extreme caution" with any doubts resolved in favor of the accused. (*People* v. *Albertson* (1944) 23 Cal.2d 550, 577 [145 P.2d 7]; *People* v. *Thompson* (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Haston, supra,* 69 Cal.2d 233, 244.)

The corollary to the rule excluding other crimes offered solely to prove criminal propensity is that evidence of other crimes is admissible when relevant to prove some fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (Evid. Code, § 1101, subd. (b).)

The majority conclude that there were sufficient similarities between the charges to permit cross-admissibility in separate trials, that evidence that defendant killed Pauline was "relevant" to the question whether he killed Tanya, and that Pauline's death was "relevant" to the issue whether Tanya died of some criminal agency. To show similarity, the majority rely upon the fact that both charges involved a wife of defendant who abruptly disappeared under suspicious circumstances indicating possible foul play. (Maj. opn., pp. 605-606.)

In order for evidence of one crime to be admissible to prove the defendant's identity as the perpetrator of another alleged offense on the basis of similarity, the two acts must have enough shared characteristics to raise a strong inference that they were committed by the same person. It is not enough that the two claimed offenses share some common marks. (*People* v. *Rivera* (1985) 41 Cal.3d 388, 392 [221 Cal.Rptr. 562, 710 P.2d 362].) The long-settled rule in California is that the "inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses." (*People* v. *Haston, supra,* 69 Cal.2d 233, 246.)

By its terms, this rule does not furnish a basis for cross-admissibility of the evidence as to Pauline on the Tanya charge. As to the Tanya charge, we do not know the circumstances of the alleged crime so we cannot look for common marks. There is no evidence that Tanya was shot as was Pauline. Pauline's body was found near the home she and defendant occupied; despite major efforts by the investigating authorities they were unable to find Tanya's body in the area where she and defendant lived.

Ordinarily, the basis of admissibility for common marks is that the defendant's conduct in the uncharged crime is similar to the conduct of the person who committed the charged crime. The common marks must support the strong inference that the charged crime bears the defendant's "signature." (*People* v. *Alcala, supra,* 36 Cal.3d 604, 632; *People* v. *Sam* (1969) 71 Cal.2d 194, 204 [77 Cal.Rptr. 804, 454 P.2d 700].) Since we have no evidence as to the conduct or marks of the person who caused Tanya to disappear, we have nothing to compare with the conduct or marks of defendant in killing Pauline. The "signature" requirement is not met by a showing that they both disappeared for that focuses on their conduct as absent, not defendant's conduct.

Similarity also furnishes a basis for admission of other criminal conduct when it furnishes an inference that the other criminal conduct and the charged crime are connected so as to disclose a general plan or system of criminal acts. The notion of a common scheme refers to a methodology or peculiar behavior pattern. (See 1 Witkin, Cal. Evidence (3d ed. 1986) § 374, pp. 343-345.) The principal purpose of the evidence showing a common scheme or plan is to identify the defendant as the perpetrator of the crime charged. (*Id.* at p. 343.) However, the mere fact that the defendant committed similar offenses does not make the exception applicable for to so conclude would undermine the exclusionary rule.

In two cases involving charges that a defendant killed his wife to obtain insurance proceeds, it was held proper to show that a prior wife that he had insured had died under incriminating circumstances as tending to establish a plan to marry, insure, and murder. (*People* v. *Lisenba* (1939) 14 Cal.2d 403, 427-428 [94 P.2d 569]; *People* v. *Gosden* (1936) 6 Cal.2d 14, 24 [56 P.2d 211].) In the instant case there is no evidence of a financial motive with respect to either wife, and there is no other evidence of defendant's conduct to show a common scheme or plan. The evidence as to Tanya fails to disclose any scheme, plan or conduct by a perpetrator of the alleged crime, which can be compared to defendant's conduct on the Pauline count.

The alternate theory of the majority that Pauline's death was relevant to establish that Tanya died from a criminal agency does not justify consideration of the Pauline evidence in determining the Tanya charge. The theory seems to be an afterthought since, as we shall see, while the jury was instructed that the evidence of one offense was cross-admissible to prove another for numerous other purposes, it was not instructed that the evidence might be considered to prove criminal agency.

In any event, it is clear that the alternate theory is based solely and totally on propensity to kill and does not justify admission of the challenged evidence. It is true that in some cases issues such as intent or motive may warrant admissibility of other crimes even though the evidence of the other crimes does not meet the similarity requirements of modus operandi or of common scheme and design. Thus, in *People* v. *Durham* (1969) 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198] (cert. den. 395 U.S. 968 [23 L.Ed.2d 755, 89 S.Ct. 2116], cert. den. *sub nom. Robinson* v. *California* (1972) 406 U.S. 971 [32 L.Ed.2d 671, 92 S.Ct. 2416]) where defendants were charged with shooting and killing a police officer during a routine traffic stop, it was held that the jury could hear evidence of uncharged offenses for which the defendants feared apprehension although the uncharged offenses bore no resemblance to the charged one. In *Durham, supra,* 70 Cal.2d 171, the relevance and materiality was not based on a theory of similar crimes, and thus propensity was not at issue.

However, when the evidence of other offenses is only material to prove the disputed issue on a theory that defendant has a propensity to commit the crime, the other-crimes evidence is not admissible unless the similarities are sufficient to establish modus operandi or common scheme or plan. (*People* v. *Alcala, supra,* 36 Cal.3d 604, 634; *People* v. *Thompson, supra,* 27 Cal.3d 303, 319, fn. 23; *People* v. *Guerrero* (1976) 16 Cal.3d 719, 725-728 [129 Cal.Rptr. 166, 548 P.2d 366].)

In the instant case, the only theory that the evidence relating to Pauline would furnish an inference that Tanya died from a criminal agency is that defendant has a propensity to kill and that for this reason Tanya's disappearance was due to homicide. In the circumstances, the criminal agency claim is merely a "euphemism" for criminal disposition. (*People* v. *Alcala, supra,* 36 Cal.3d 604, 634; *People* v. *Tassell* (1984) 36 Cal.3d 77, 89 [201 Cal.Rptr. 567, 679 P.2d 1].)

It is true that the evidence of similar crimes is relevant to the issues of criminal agency and identity, but evidence of criminal disposition and pro-

pensity is always relevant, and to allow relevance to determine admissibility of similar crimes would abrogate the three-century-old rule codified by Evidence Code section 1101, subdivision (a).

I conclude that the evidence bearing on the Pauline and Tanya counts was not cross-admissible. Although concluding the evidence was cross-admissible, the majority fail to discuss the above cases with respect to the issue whether the evidence was cross-admissible, and the only case cited by the majority on the issue (*People* v. *Archerd* (1970) 3 Cal.3d 615, 621 [91 Cal.Rptr. 397, 477 P.2d 421]), is clearly distinguishable. At the trial of defendant for murdering two of his wives and his nephews, evidence was admitted in *Archerd* of uncharged murders of another wife, a friend, and the ex-husband of one of his wives. The majority neglect to tell us that all six offenses were committed by insulin poisoning or that the court stated: "This is the only known reported case of murder by insulin poisoning in the United States." (3 Cal.3d at p. 621.) No such unique method of murder appears in the instant case. The fact that three of Archerd's six victims were his wives is of no help to the majority.

## II. THE RESULTING ERRORS

The conclusion that the evidence was cross-admissible led to several errors.

When, as here, the statutory requirements for joinder of two or more different offenses are met, a defendant can predicate error in denying a motion for severance only on a clear showing of prejudice. (Pen. Code, § 954; *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699]; *People* v. *Smallwood* (1986) 42 Cal.3d 415, 425 [228 Cal.Rptr. 913, 722 P.2d 197], mod. 42 Cal.3d 710a.) Under *Williams*, refusal to sever may be an abuse of discretion where "(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all; and (4) any one of the charges carries the death penalty." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 173 [222 Cal.Rptr. 184, 711 P.2d 480].)

As we have seen, the majority erred in concluding the evidence on the Tanya count and the Pauline and Tony counts was cross-admissible. The charges involve the killing of two wives and a stepson and are likely to be

inflammatory. As the majority recognize in perhaps an understatement, the evidence on the Tanya charge was relatively weak, and defendant was not charged until the discovery of Pauline's and Tony's bodies. (Maj. opn., p. 606.) I submit that the evidence on the Tanya charge, when we exclude her statements of fear and the evidence on the Pauline and Tony charges, is insufficient as a matter of law to sustain the conviction. In this circumstance, there is an obvious danger of a "spillover"; indeed, a "spillover" is essential.

The majority state that the fact that the jury found defendant guilty of only second degree murder of Tanya "strongly suggests that the jury was capable of differentiating between defendant's various murders; no improper spillover effect is evident here." (Maj. opn., p. 607.) However, the majority opinion itself refutes the point. The majority state that the prosecution's case on the Tanya count was "weak," that defendant was not charged with killing Tanya until the subsequent deaths were discovered, and that "with the discovery of Pauline's and Tony's bodies, the Tanya murder case suddenly became much stronger." (Maj. opn., p. 606.) The majority cannot consistently state that there is no "spillover" and at the same time point out the importance of the "spillover" to the prosecutor's case. Finally, the fourth factor stated in *Balderas, supra,* 41 Cal.3d 144, a death penalty charge, is also present.

Defendant has made an overwhelming showing of prejudice due to joint trials. The Tanya charge related to matters occurring several years before the Pauline and Tony offenses, and considerations of judicial economy cannot warrant denial of severance. (*Williams* v. *Superior Court, supra,* 36 Cal.3d 441, 451 et seq.)

The trial court abused its discretion in denying the motion to sever.

The error in instruction was that the court instructed the jury that evidence of each homicide count might be used as to any other count of homicide for certain purposes.[1] Rather than an instruction that evidence of

---

[1] The court instructed the jury: "Evidence has been introduced in this case of more than one count of homicide. The evidence in one or more of the counts may be used together with any other count for which the defendant is on trial for certain purposes.

"Such evidence, if believed, was not received and may not be considered by you to prove that he is a person of bad character or that he has a disposition to commit crimes.

"Such evidence was received and may be considered by you to prove an individual count and for the limited purpose of determining if it tends to show: (1) A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show (A) the exis-

one offense may be considered as to another, the jury should have been told just the opposite, that evidence of the other offenses may *not* be considered in connection with the Tanya count.

When the evidence with respect to Pauline and Tony is excluded from consideration on the Tanya count, the evidence is insufficient to sustain the conviction.

The reappearance of claimed murder victims after their convicted slayers had been executed caused courts long ago to adopt stringent rules to avoid the ultimate miscarriage of justice. (See, e.g., Perkins, *The Corpus Delicti of Murder* (1962) 48 Va.L.Rev. 173, 191-195; Comment, *Evidence—Proof of Particular Facts—United States v. Woods* (1974) 87 Harv.L.Rev. 1074, 1079.) While communications may have greatly improved, permitting police missing persons departments to sometimes locate people who disappear, there is little reason to believe they are always successful.

Nevertheless, convictions for murder have been upheld in a number of cases where, while the body of the victim was never recovered and there were no witnesses to the crime, the defendant had made plans to kill, or had made confessions or damaging admissions. (*People v. Cullen* (1951) 37 Cal.2d 614, 625 [234 P.2d 1]; *People v. McMonigle* (1947) 29 Cal.2d 730 [177 P.2d 745]; *People v. Manson* (1977) 71 Cal.App.3d 1, 43 [139 Cal.Rptr. 275]; *People v. Clark* (1925) 70 Cal.App. 531 [233 P. 980].) Once there is prima facie proof of the corpus delicti, the defendant's admissions and confessions may come in, and the admissions and confessions may be considered by the jury in determining whether the prosecution has met its burden of proving the elements of the crime beyond a reasonable doubt. (*People v. Cullen, supra,* 37 Cal. 2d 614, 624-625; *People v. Manson, supra,* 71 Cal.App.3d 1, 43.)

One case has upheld a conviction where there were no confessions or admissions. (*People v. Scott* (1959) 176 Cal.App.2d 458 [1 Cal.Rptr. 600].) In *Scott,* the prosecution not only proved a disappearance under mysterious

---

tence of the intent which is a necessary element of the crime charged; (B) the identity of the person who committed the crime, if any, of which the defendant is accused; (C) a clear connection between the one offense and other offenses of which defendant is accused so that it may be logically concluded that if defendant committed the other offenses, he also committed the crime charged in a different count.

"(2) The existence of the intent which is a necessary element of the crime charged.

"(3) The identity of the person who committed the crime, if any, of which the defendant is accused.

"(4) A motive for the commission of the crime charged.

"If you consider any evidence for such limited purpose, you must weigh it in the same manner as you do all the evidence in the case."

circumstances but also showed that the defendant had taken numerous steps both before and after his wife's disappearance establishing a scheme to steal her fortune, including the forging of numerous documents, and conduct immediately after the disappearance indicating that he was aware of the circumstances causing the disappearance. (176 Cal. App.2d at pp. 498-499.) No such showing was made in the instant case.

When we disregard the evidence of Tanya's fear and exclude from consideration on the Tanya count the evidence of Pauline's death, all that is left is a mysterious disappearance. That evidence is insufficient to convict.

### III. The Fear Evidence

Since the majority concede the error in admitting the fear evidence, it may be treated briefly. Over the objection of defendant, the trial court erroneously admitted evidence that Tanya had said that she feared defendant, including testimony that she was "scared to death" of defendant and his "terrible temper."

The majority recognize that the admission of the evidence of Tanya's fear was error under Evidence Code section 1250 and *People* v. *Armenderiz* (1984) 37 Cal.3d 573, 586 [209 Cal.Rptr. 664, 693 P.2d 243]. The majority state that "in the present case, we can ascertain no purpose for admitting evidence of the victims' expressions of fear of defendant other than as proof that those fears were justified, and that defendant in fact killed them. In short, neither the state of mind of these victims prior to their deaths (§ 1250, subd. (a)), nor their acts or conduct (*id.,* subd. (b)), were an issue in the case which might have been resolved or assisted by the challenged evidence." (Maj. opn., *ante,* p. 608.)[2]

### IV. Prejudice

The erroneous denial of the severance motion, the error in instructing that the evidence as to the offenses was cross-admissible, the insufficiency of proper evidence, and the erroneous admission of the fear evidence require reversal of the judgment of guilt on the Tanya charge. However, there was substantial evidence of guilt as to the Pauline and Tony charges, and defendant did not mount a defense. My examination of the record convinces me that it is unlikely that the jury's knowledge of the evidence bearing on the Tanya count was a factor in its verdict on the other counts. According-

---

[2] While my analysis of the error differs to some extent from the majority, it is unnecessary to extend the discussion since the majority in effect concede the error.

ly, I join in the affirmance of the guilt and special circumstances findings as to Pauline and Tony.

Although the errors occurred at the guilt trial, the jury was instructed at the conclusion of the penalty trial that it should consider all evidence received at any part of the trial and the circumstances of the crimes of which the defendant was convicted in the present proceeding. Thus the errors were carried forward to the penalty trial.

Obviously, a conviction of second degree murder is an important factor to be considered in the assessment of the appropriate penalty. In the present case defendant established that he had no prior convictions, and there was no proper evidence, aside from the offenses charged, that defendant ever acted violently as to anyone. The People presented no evidence at the penalty trial. In these circumstances, there is far more than a reasonable possibility that the errors affected the verdict, and the errors were substantial requiring reversal as to penalty.

Appellant's petition for a rehearing was denied April 7, 1988, and the opinion was modified to read as printed above.