Filed 4/21/25  P. v. Aguilar CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROBERT MARK AGUILAR,<br><br>     Defendant and Appellant. | A172263<br><br>(San Bernardino County<br>Super. Ct. No. FWV23001318) |

We consider this appeal upon its transfer from the Fourth Appellate District.  Defendant Robert Mark Aguilar appeals from a judgment convicting him of multiple offenses against his former spouse, Jane Doe, for which he was sentenced to eight years in state prison.  Aguilar contends the trial court prejudicially erred by consolidating for trial two criminal cases brought against him and by admitting into evidence at trial proof of certain uncharged prior bad acts.  We conclude his arguments lack merit and affirm.

### I. BACKGROUND

#### A. *The Charges Against Aguilar*

All of the charges against Aguilar involved his conduct towards Jane Doe.  In April 2023, the San Bernardino County District Attorney's Office filed a complaint against him in case number FWV23001316 regarding an incident that occurred on October 21, 2022 (October 2022 case).  As later

1

amended after a preliminary hearing, Aguilar was charged with misdemeanor infliction of corporal injury upon a former spouse (Pen. Code,[1] §§ 273.5, subd. (a), 17, subd. (b)) and misdemeanor interference with a wireless communication device (§ 591.5). Ten aggravating sentencing factors were alleged regarding both counts (§ 1170, subd. (b)(2)).

In May 2023, the San Bernardino District Attorney's Office filed a first amended information against Aguilar in another case, number FWV23001318, alleging one count regarding an April 3, 2023 incident and four counts regarding an April 10, 2023 incident (April 2023 case). Regarding the April 3 incident, Aguilar was charged with misdemeanor violation of a domestic relations court order (§ 273.6, subd. (a)). Regarding the April 10 incident, he was charged with felony assault with intent to commit a felony (which the jury was instructed was oral copulation) (§ 220, subd. (a)(1)); felony criminal threats (§ 422, subd. (a)); misdemeanor battery on a former spouse (§ 243, subd. (e)(1)); and misdemeanor violation of a domestic relations court order (§ 273.6, subd. (a)). Eighteen aggravating sentencing factors were alleged regarding all five counts. (§ 1170, subd. (b)(2).)

## B. *Jane Doe's Trial Testimony*

At trial, the prosecution's principal evidence regarding all the incidents was Jane Doe's testimony. She testified that she and Aguilar were involved romantically off and on for 24 years and married for 19 years until their divorce was finalized on March 15, 2023. They raised three children together, who were young adults at the time of trial.

In the ten years before their divorce, the relationship between Jane Doe and Aguilar was "really rocky." In October 2022, Doe began efforts to obtain a restraining order against him but stopped before obtaining one. In

---

[1] Undesignated statutory references are to the Penal Code.

2

February 2023, she obtained a temporary restraining order that barred him from contacting or abusing her, and from coming within 100 yards of her or her home, vehicle, and workplace. On March 13, 2023, the court issued a permanent restraining order that prohibited Aguilar from these same actions until March 13, 2026. The order was personally served on Aguilar that same day.

### 1. The October 21, 2022 Incident

On the evening of October 21, 2022, Doe left work and stopped at a convenience store. When she came out of the store, Aguilar "pop[ped] out of nowhere." She unlocked her car and got in; Aguilar got in the backseat at the same time. She told him to get out or she would drive to a grocery store across the street with him in the car. When he did not leave, she drove to the store and went inside, as did Aguilar.

Doe saw Aguilar again as she walked back to her car. When she unlocked her car to get in, he got in the back seat behind the driver's seat. Doe got into the driver's seat anyway, thinking Aguilar would leave when she told him her mother was waiting for her. But when she told him, he just said, " 'You always say your mom's waiting for you.' "

Aguilar argued with Doe about something she had posted on social media that his mother had told him about. Doe told him, " 'Fuck your mom.' " Aguilar grabbed her right arm, pulled it up, and put his other arm around her neck. She could not breathe and told him that; he responded by "cussing" and being "upset" with her. After no more than a minute, he let go, kind of hugged her, and said he was sorry and that he did not mean to do those things.

Doe told Aguilar she hated him and was going to call the police. She started to call on her cell phone but Aguilar tried to grab it, so she put it out of his reach and tried calling from her car's screen. Aguilar reached over and

3

stopped the call on the screen. Doe said she wished her boyfriend would kill him, and Aguilar responded by pressing his fist to the right side of her jaw and applying pressure for about 30 to 40 seconds, causing her a lot of pain and to cry. He punched her in the back of her head, twice she believed, causing her more pain. He then got out of the car, took money from her purse, threw water on her, said she would never see him again, and walked away. Doe reported the incident to the police.

As a result of the incident, Doe had a large bump on her face, a "little busted lip," and scratches on her hand. Photographs of her injuries were introduced into evidence.

### 2. The April 3, 2023 Incident

On the morning of April 3, 2023 (after Doe's divorce of Aguilar became final), Doe drove to work by a different route than usual. She saw Aguilar following her in his car, then "lost him." When she exited her car at her workplace, he was in front of her. He asked her why she took a different route to work that day and told her he would "mess up" her car if she did not see him for lunch. She told him to stop acting crazy, went into her workplace, and called the police.

### 3. The April 10, 2023 Incident

On April 10, 2023, Doe was napping during her lunch hour in the driver's seat of her car, parked in her workplace's outdoor parking lot. At around 12:45 to 12:50 p.m., Aguilar parked his car directly behind and perpendicular to hers, got out, woke her up by knocking on a window, and told her to open the door. She did not but after a few moments of back and forth between them, she opened the driver-side door to return to work. Aguilar pulled the door open and entered the car, squeezing himself into the left and partially on top of Doe by putting his right leg over her left one, and shut the car door.

4

Doe said she had to go back to work.  Aguilar "stopped" her, said he was really hot, and told her to touch his stomach.  She declined but when he said, " 'Just touch it,' "she did; she noticed he was "really sweaty."  He then lowered his very loose shorts, exposed his penis, which was flaccid, and said, " 'Suck my dick.' "  Doe recounted at trial that Aguilar said this; she also characterized it as his "asking" her to perform oral sex on him, although she did not think he said, " 'Can you.' "  He "asked" her three times to touch his penis, back-to-back.  In the past, it had not been unusual for them to have oral sex together.  When they had, his penis was always hard.

Doe said no to having oral sex with Aguilar in her car that day and turned her head toward the passenger-side window to show her unwillingness.  Aguilar grabbed her head and turned it towards him with his right hand, Doe at trial indicating his action by placing her hand on the side of her head over her ear.

The two wrestled for three to five minutes, Aguilar moving Doe's head toward him and Doe moving it away.  Doe testified that he moved her head towards his face, but "wasn't pushing it down," although she acknowledged telling the police he pushed her head towards his penis.  She testified that she pulled her head away except for one time when she looked at his penis.  She told a police officer responding to the incident that the force Aguilar used in moving her head was maybe as much force as is used to close a door.

After refreshing her memory by looking at a transcript of her statement to police on the day of the incident, Doe testified that after Aguilar tried to force her head towards her, he put his hand on her lap and lifted up his waist, pushing his groin towards her.  She kept telling him she had to go and was going to be late.

5

Aguilar pulled his pants back up. Referring to her stepfather, he said, " 'You can suck Rick's dick, but you can't suck mine?' " Also, during the incident he told her "that if he did go to jail for this he was going to kill [her]." She was afraid he would hurt her. She later told police she did not think he would kill her, but that, "because he was on heavy drugs," she thought he would hurt her.

Doe continued to tell Aguilar she had to go and he exited her car. Doe then exited herself. She opened her trunk to give him some towels he wanted. Aguilar then said he would "fuck [her] up" if she left right away because he wanted to give her a letter that an ex-boyfriend had written to her. She stayed, afraid he was going to hurt her. He gave her the letter and she walked away as he was saying something and went into her workplace. She reported the incident to the police.

Doe did not believe she spoke to Aguilar that day about the restraining order that prohibited him from coming to her workplace. She told him about it on other occasions when he came to her workplace and he denied the order prohibited him from being there. She also told him video cameras were used in the area.

Before trial, Doe spoke by phone with the district attorney's office to ask that it drop the "sexual charges" in the case. She did this for Aguilar's safety because he was the father of her children and she would always love him. Also, her children were receiving phone calls that he was being beaten up in jail. In the call to the district attorney's office, Doe said she believed Aguilar only wanted her to look at his penis and was not forcing her to perform oral sex, and that he was wearing baggy pants without a belt that were coming down, so she obviously was able to see his penis.

6

## C. *The Surveillance Camera Recording*

A surveillance camera's video recording of the outside of Doe's car during the April 10, 2023 incident was played at trial as Doe testified about the incident. It shows Aguilar parking his car behind and perpendicular to Doe's car, exiting his car wearing loose shorts that he appears to hold up with his hands, going to Doe's driver's side and passenger side windows, and knocking on them. Then, he returns to the drivers-side door, it opens, and he gets in the car and, with a little difficulty, closes the door. There is no movement of the car evident until about four minutes later when Doe's car's trunk opens. About a minute and a half later, Aguilar and then Doe exit the car. They go to the trunk of her car, where they are partially blocked from the camera's view by Aguilar's car. After some conversation, as Doe stands by, Aguilar goes into his car and then to his open car trunk, and hands her what appears to be a letter, which she reviews. She then walks away towards a building with the letter, leaving Aguilar behind. He eventually drives away.

## D. *Evidence of Aguilar's Prior Uncharged Bad Acts*

After conducting a hearing pursuant to Evidence Code section 402 to consider evidence proffered by the People, the court permitted them to introduce evidence of four prior uncharged bad acts by Aguilar, all of which were introduced via Doe's testimony.

First, on March 13, 2023, Doe was asleep at her home at about 2:30 to 3:00 in the morning when her daughter woke her up and said she had heard rocks being thrown at a window. Doe looked outside. She saw mud on the window and Aguilar walking away from the area. She reported the incident to the police.

Second, on March 18, 2023, Doe was sleeping on a couch in the living room of her home when Aguilar called her and told her to open the door

because he wanted to have sex with her. She refused. He ended up knocking on a window and the dogs started barking; he called Doe and told her to shut the dogs up and that he would be back in five minutes, but he did not return. After he left, she found that the back patio's ring camera was missing and a wire was hanging down where the camera had been. Doe's mother reported the incident to the police.[2]

Third, on the evening of April 3, 2023, Doe left work in her car and soon noticed Aguilar was following her. He drove up on the side of Doe's car and told her to pull over but she refused. As she called the police to report that he was following her, Aguilar bumped her car with his, though not at a moderate or significant speed, and then stopped his car in front of hers. She stopped and Aguilar exited his car and tried unsuccessfully to open Doe's car door. Doe, talking to a police dispatcher, drove around Aguilar and parked in front of her house. Aguilar, in his car about 10 to 20 feet away, "flipped [her] off." She told police about this incident as well.

Fourth, on April 8, 2023, Doe and her stepfather, Rick, went to a storage unit she shared with Aguilar to retrieve her belongings after he decided to stop paying for the unit. Aguilar appeared, questioned Doe about who she brought with her and, when Rick carried some boxes into the unit, exchanged words with Rick and started arguing and wrestling with him. Doe told Rick to go to her car and, after Rick left, Aguilar pushed Doe and said, " 'Why do you want to be a little whore?' " After leaving, Doe reported the incident to the police.

---

[2] At the Evidence Code section 402 hearing, Doe testified that she did not know the date when this ring camera incident occurred but that it was about three weeks before March 18, 2023. At trial, the prosecutor referred to the "ring camera" incident as occurring on March 18, 2023, and Doe did not disagree.

E. *Verdict, Sentence and Appeal*

The jury found Aguilar guilty of all seven counts. After the trial court granted the People's motion to dismiss some aggravating factors, it found most of those still alleged to be true. The court subsequently sentenced Aguilar to a total prison term of eight years, followed by a period of parole of three to four years, imposed certain fines and fees, and awarded Aguilar 280 days of custody and conduct credits.

Aguilar filed a timely notice of appeal.

## II. DISCUSSION

A. *The Trial Court Did Not Err in Consolidating the Cases*

Aguilar argues the trial court erred in consolidating the two cases because doing so caused him undue prejudice under state law and because the resulting joint trial was fundamentally unfair to him and violated his federal constitutional rights.

### 1. The Relevant Proceedings Below

Prior to trial, the People filed a written motion under section 954 to consolidate the October 2022 and April 2023 cases. Their proffer regarding the October 21, 2022 and April 3, 2023 incidents was much the same as Jane Doe's trial testimony, except that the People contended Doe told Aguilar on October 21, 2022 that "he was not supposed to be there because of a temporary restraining order."

Regarding the April 10, 2023 incident, the People proffered that Jane Doe, napping in her car in her workplace's parking lot during her lunch hour, "was woken up by [Aguilar] pounding on her driver's side window." After some back and forth, Aguilar, on the driver's side of Doe's car, "forced himself on top of her, into her car. He managed to use his body to press hers against the seat and close the door. Inside the car, [Aguilar] and Jane Doe argued. [Aguilar], who was wearing extremely baggy pants that he was holding

9

together by the waistband, pulled his pants down to expose his flaccid penis. He told Jane Doe to orally copulate him, and she refused. [Aguilar] lifted his hips to bring his groin closer to Jane Doe's face as he used his hand to push downward on Jane Doe's head, moving her towards his penis. After about five minutes, [Aguilar] eventually stopped. Jane Doe mentioned the restraining orders that listed [Aguilar] as a restrained party, and [Aguilar] told her that if he was ever arrested on any violation of restraining order case, he would kill her. The two exited the car, and the two began an exchange of property. During this exchange, [Aguilar] told Jane Doe that if she went back to her office, he would hurt her, so she stayed until the exchange was complete."

The People argued in support of consolidation that the two cases involved charges of the same class that were connected together in their commission because they involved violent confrontations with the same victim, Jane Doe, in her car, during which she told Aguilar a restraining order prohibited him from being near her. Also, the cases involved similarities in time and location, the evidence supporting them would be cross-admissible if the two cases were tried separately, and consolidation would not unduly prejudice Aguilar because the type and strength of the evidence were similar and, therefore, the jury would not be inflamed by the admission of all the evidence being admitted in either case.

The court considered the People's consolidation motion at a subsequent motion in limine hearing. Aguilar's counsel objected to the motion at the hearing, arguing there was not necessarily any "crossover" between the cases, that the October 2022 case was significantly weaker than the April 2023 case, and that the April 2023 case involved coercion rather than physical violence.

10

The trial court granted the consolidation motion. It explained, "I don't believe there's any undue prejudice likely by consolidating the two for judicial economy, and also for the alleged victim so that she doesn't need to testify twice in two different proceedings. I will consolidate the two cases over Defense objection. Especially since there was a restraining order in place in the misdemeanor [October 2022] case, as there is a restraining order in place in the felony [April 2023] case. And it, of course, involves the same defendant, same alleged victim."

### 2. Legal Standards

A trial court considers a consolidation motion such as the People's under section 954. In relevant part, section 954 allows the joinder of two accusatory pleadings filed in the same court that contain "different offenses connected together in their commission" or contain charges "of the same class of crimes or offenses," and further provides that "the court . . . , in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts . . . be tried separately . . . ."

"[W]ithin the meaning of section 954, offenses are 'of the same class' if they possess common characteristics or attributes." (*Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, 722.) For example, "robbery and murder . . . are . . . deemed to be of the 'same class,' insofar as both offenses share common characteristics as assaultive crimes against the person." (*People v. Lucky* (1988) 45 Cal.3d 259, 276; *People v. Alvarez* (1996) 14 Cal.4th 155, 188 [same]; see also *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219–1220 (*Alcala*).)

"Joinder is ordinarily favored because it avoids the increased expenditures of funds and judicial resources that may result from separate trials." (*People v. Simon* (2016) 1 Cal.5th 98, 122.) "Joinder, therefore, 'is the course of action preferred by the law.' " (*Ibid.*) Consistent with this

11

preference, "[w]here joinder is proper under section 954, '[t]he burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*People v. Hin* (2025) 17 Cal.5th 401, 438 (*Hin*).)

"In determining whether a court abused its discretion in declining to sever properly joined charges, we first 'consider the cross-admissibility of the evidence in hypothetical separate trials.' " (*Hin*, *supra*, 17 Cal.5th at p. 438.) "[C]omplete (or so-called two-way) cross-admissibility is not required. In other words, it may be sufficient, for example, if evidence underlying charge 'B' is admissible in the trial of charge 'A'—even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.' " (*Alcala*, *supra*, 43 Cal.4th at p. 1221.)

The cross-admissibility of evidence " 'is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' " (*Hin*, *supra*, 17 Cal.5th at p. 439; *Alcala*, *supra*, 43 Cal.4th at pp. 1220–1221.) When cross-admissibility is not sufficient to dispel any suggestion of prejudice, a court also considers " '(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case.' " (*Hin*, *supra*, 17 Cal.5th at p. 439.) A court also weighs these factors against the benefits of joinder. (*People v. Soper* (2009) 45 Cal.4th 759, 783 (*Soper*).)

In short, "[i]n the context of properly joined offenses, we assess potential prejudice not under Evidence Code section 352, but instead in the context of the traditional four factors" (*Alcala*, *supra*, 43 Cal.4th at p. 1222,

12

fn. 11), meaning the cross-admissibility of charges; the tendency of the charges to inflame the jury (the so-called " 'spill-over' effect" (*Soper*, *supra*, 45 Cal.4th at p. 775)); the bolstering of a weak case; and the conversion of noncapital charges into a capital case. (*Alcala*, at p. 1222, fn. 11.) Of course, to the extent Evidence Code section 352 is implicated in an analysis of cross-admissibility, it is to be considered, but we also bear in mind that our Supreme Court has "repeatedly . . . found a trial court's denial of a motion to sever charged offenses to be a proper exercise of discretion *even when the evidence underlying the charges would not have been cross-admissible in separate trials*." (*Acala*, at p. 1221, original italics.)

We also keep in mind that, " '[e]ven if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that "the joint trial resulted in such gross unfairness as to amount to a due process violation." ' " (*Hin*, *supra*, 17 Cal.5th at p. 439.)

We review a trial court's consolidation motion ruling for abuse of discretion (*Alcala*, *supra*, 43 Cal.4th at p. 1220; *Soper*, *supra*, 45 Cal.4th at p. 774), keeping in mind that " '[t]he state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence.' " (*Alcala*, at p. 1221.) " 'The burden of demonstrating that consolidation or denial of severance was a prejudicial abuse of discretion is upon [the party] who asserts it; prejudice must be proved, and "[a] bald assertion of prejudice is not enough." ' " (*People v. Ruiz* (1988) 44 Cal.3d 589, 605.)

### 3. Analysis

Aguilar does not dispute that the October 2022 and April 2023 cases involved offenses that are "connected together in their commission" and "of the same class." (See § 954.) The court did not abuse its discretion in

concluding that they did, especially because both involved allegations that Aguilar committed assaultive crimes against Doe. (*People v. Lucky, supra*, 45 Cal.3d at p. 276; *People v. Alvarez, supra*, 14 Cal.4th at p. 188; *Alcala, supra*, 43 Cal.4th at pp. 1219–1220.)

a. *Aguilar's Undue Prejudice Argument Lacks Merit*

Aguilar begins his undue prejudice argument by contending, based on the People's proffer in their consolidation motion, that the evidence in the two cases was not cross-admissible. As we have discussed, one-way cross-admissibility only is required. (*Alcala, supra*, 43 Cal.4th at p. 1221.) Accordingly, we first focus on whether the evidence of the October 2022 case would be admissible in a separate trial of the April 2023 case.

Aguilar argues the October 2022 evidence was not admissible in the April 2023 case under Evidence Code sections 1109 and 352. Section 1109 provides in relevant part that in a domestic violence case, "evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 [prohibiting the admission of propensity evidence subject to certain exceptions] if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(1).) Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

In determining whether Evidence Code section 1109 propensity evidence of another offense is admissible, a court engages in "a careful weighing process under section 352" by "consider[ing] such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely

14

prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other . . . offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 [regarding Evidence Code section 1108 propensity evidence of other sex offenses] (*Falsetta*); *People v. Brown* (2000) 77 Cal.App.4th 1324, 1333–1334 [concluding the reasoning underlying the *Falsetta* opinion also applies to Evidence Code section 1109 evidence].)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . 'The "prejudice" referred to . . . applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638; see also *People v. Wang* (2020) 46 Cal.App.5th 1055, 1075–1076 (*Wang*).) " 'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

We review a trial court's rulings under Evidence Code section 352 for abuse of discretion. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 75.)

Aguilar concedes there is "some relevance" between the October 2022 and April 2023 allegations because they both involved claims that he committed domestic violence against the same person, Jane Doe, and further

15

concedes there are "some similarities" between the two cases, as both involved allegations that he attacked Doe in her car.

Nonetheless, Aguilar contends under *Falsetta* and other cases that the consolidation of the two cases was "severely prejudicial" to his chances in the April 2023 case and, therefore, improper. He emphasizes that there were no sources of information regarding the October 2022 incident independent of Jane Doe, the complaining witness in both cases (see *People v. Lewis* (2009) 46 Cal.4th 1255, 1287 [independent sources of the subject evidence increased its probative value]). Further, the October 2022 incident involved allegations that Aguilar engaged in "extremely inflammatory and violent" acts, and, therefore, admission of that evidence would be "much more inflammatory" to the jury than the evidence of the April 2023 incidents. These allegations include "that after [Aguilar] got into Doe's car on October 21, 2022, he . . . tried to take her phone to keep her from calling police; grabbed her right arm, held it up toward the ceiling; used his left arm to put Doe in a chokehold from behind for about one minute, causing her to have difficulty breathing; after letting her go . . . used his right fist to apply pressure to her jaw, causing swelling; . . . punched her in the back of the head twice; [and] . . . caused two cuts to Doe's lip and two cuts to her left hand."

On the other hand, Aguilar contends, the prosecution alleged Aguilar made verbal threats in both April 2023 incidents and, regarding the April 10, 2023 incident, did not allege that Aguilar's penis ever touched Doe, that she ever touched it, or that Aguilar physically harmed Doe or injured her physically. Also, contrary to People's contention and the trial court's finding, the October 2022 incident did not involve Aguilar's violation of a restraining order, as none were in place at the time, unlike when the two April 2023 incidents allegedly occurred.

16

Aguilar further asserts it was reasonably probable a jury would convict him of the April 2023 case charges based on the October 2022 incident. He argues the evidence that on April 10, 2023 he "intended to commit oral copulation against Doe's will and . . . use enough physical force to overcome Doe's will to accomplish the act, was very weak at best . . . ." The prosecutor did not allege he forced Doe to touch his penis, that his penis touched her or came close to her mouth, or that his penis was erect; the two had a history of engaging in oral copulation; and the prosecutor's proffer included that Aguilar stopped seeking Doe's oral copulation of him after about five minutes, at which time they both exited the car.

Also, Aguilar argues, the October 2022 evidence was not sufficiently probative of his intent on April 10, 2023 (see Evid. Code, § 1101, subd. (b) [propensity evidence admissible to prove intent, among other things]) because the incidents were insufficiently similar and the intent required to prove the April 10, 2023 incident was different than that required for the October 2022 incident.

We disagree with Aguilar's contentions. The trial court's explanation of its reasons for granting the consolidation motion indicate it concluded consolidation would yield substantial benefits, that the evidence of the two cases was cross-admissible because none of it was unduly prejudicial, and that the evidence of each case was probative of the other because both cases involved Aguilar's alleged violation of a restraining order, the same defendant, and the same victim. Although the court erred in thinking the October 2022 incident involved Aguilar's violation of a restraining order— none had been issued against him as of October 2022—we conclude the remainder of its conclusions were reasonable.

17

Aguilar gives short shrift to the case-specific and systemic economies that the court could reasonably conclude would result from consolidation. By trying the cases together, the court, the parties and Doe, the complaining witness in both cases, would have to participate only once in proceedings regarding her testimony (including the Evidence Code section 402 hearing conducted in the consolidated case). Further, as our Supreme Court explained at length in *Soper*, "as a general matter, a single trial of properly joined charges promotes important systemic economies. Whenever properly joined charges are severed, the burden on the public court system of processing the charges is substantially increased. . . . For example, each of the numerous procedural steps attendant to any criminal proceeding—such as . . . pretrial motions, as well as trial sessions themselves—would proceed on discrete tracks. Additionally, when two previously joined matters advance to separate trials, approximately twice as many prospective jurors would need to be summoned and subjected to the selection process.

"Further amplifying these and related trial-level inefficiencies resulting from separate trials is the appeal of right afforded to all convicted criminal defendants. Separate appellate records would be compiled by the clerk's offices of the respective trial courts. . . . Furthermore, the Court of Appeal, through its own clerk's office, would be required to manage and process discrete appeals, and provide an opportunity for separate oral arguments. Individual written decisions would be drafted, considered, and filed. Subsequently, separate petitions for rehearing could be filed in the Court of Appeal, followed by individual petitions for review in this court." (*Soper*, *supra*, 45 Cal.4th at p. 782.)

In light of these substantial benefits from consolidation, Aguilar was required to "make a clear showing of prejudice to demonstrate that the trial

18

court abused its discretion." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 746.) He did not for multiple reasons.

To begin with, Aguilar, while conceding similarities between the cases, dismisses the probative value of the October 2022 evidence, which was significant, especially because of the parties' debate over Aguilar's intent during the April 10, 2023 incident. The prosecution contended, among other things, that on April 10, 2023, Aguilar appeared suddenly at Doe's car and forced his way into it and on top of her; exposed his penis and insisted that she orally copulate him; when she refused, grabbed her head and attempted to force it towards his penis and pushed his groin area up and in her direction; and threatened to kill her if he were arrested for violating the restraining order. These actions are consistent with his actions on October 21, 2022, including his sudden appearance, his unpermitted entry into Doe's car, his refusal to abide by her wishes that he leave, and his use of force against her. Therefore, the October 21, 2022 incident was probative of Aguilar's intent on April 10, 2023.

Nor is the evidence of the October 21, 2022 incident necessarily more inflammatory than the April 10, 2023 incident, or the evidence of Aguilar's intent on April 10, 2023 particularly weak. Both incidents involved Aguilar's surprise assault on Doe in her car. While on October 21, 2022 alone Aguilar violently attacked Doe, causing her physical injury, on April 10, 2023—after Doe had obtained a restraining order against him—Aguilar exposed himself, insisted Doe orally copulate him in the middle of the day in her car at her workplace parking lot, grabbed and wrestled with her head as he insisted that she perform this sex act, and threatened to kill her. These acts are shocking in their own right; indeed, a reasonable jurist could conclude they are even more shocking than the alleged events of October 21, 2022.

19

Further, the evidence proffered by the People regarding Aguilar's intent on April 10, 2023 was not particularly weaker than the evidence proffered of the October 21, 2022 incident. "[I]t always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper*, *supra*, 45 Cal.4th at p. 781.) Here, the cases were of similar strength overall (perhaps explaining why Aguilar objected to consolidation below in part on the ground that the *April 2023* case, not the October 2022 case, was the stronger of the two). The People relied on Doe's testimony of Aguilar's assault of her for both incidents. Both incidents were in parts corroborated—the October 21, 2022 incident by photographs of Doe's injuries and the April 10, 2023 incident by a surveillance video showing Aguilar's blocking of Doe's car with his own in her workplace's parking lot and his entry into Doe's car for a span of over five minutes.

More to the point, the People's proffer of the evidence they would present at trial of Aguilar's actions on April 10, 2023 left little if any doubt that he intended to force Doe to orally copulate him. Again, the People contended he forced his way into her car and on top of her when she was napping in her workplace parking lot, exposed his penis, insisted she orally copulate him and, when she refused, tried to force her head in the direction of his penis as he raised it in her direction. If that were not enough, he threatened to kill her. This can hardly be characterized as a clumsy act of seduction, as Aguilar's contentions suggest.

Aguilar further argues that if the two cases had been tried separately, "there would have been no chance that [Aguilar] would have been convicted of

the alleged October incident at the time of the trial on the April incidents." Therefore, he contends, citing cases such as *Soper*, *supra*, 45 Cal.4th at pp. 772–773, this rendered the admissibility of the "uncharged acts" even more prejudicial because the jury could have wanted to punish him for these uncharged acts. Aguilar confuses charging with conviction—obviously, the People had already charged him with committing offenses on October 21, 2022 at the time it moved to consolidate the two cases. Therefore, this argument also lacks merit.

In short, we have no quarrel with the trial court's conclusion that the evidence of the October 21, 2022 incident would be admissible in a separate trial of the April 2023 case.[3] We also think this conclusion is sufficient to dispel the suggestion of prejudice by the consolidation of the cases. But even if it were not, we have already indicated by our discussion our view that the other factors considered in determining prejudice—the tendency of the charges to inflame the jury, the bolstering of a weak case with a strong case, and the conversion of noncapital charges into a capital case (*Alcala*, *supra*, 43 Cal.4th at p. 1222, fn. 11)—all break in favor of concluding the trial court did not abuse its discretion under section 954 by consolidating the two cases.

      b. *The Consolidation of the Two Cases Did Not Render the Joint Trial Fundamentally Unfair to Aguilar*

As we have discussed, our review of the trial court's consolidation of the two cases also requires that we consider if Aguilar has demonstrated that " ' "the joint trial resulted in such gross unfairness as to amount to a due process violation." ' " (*Hin*, *supra*, 17 Cal.5th at p. 439.)

---

[3] Accordingly, we have no need to decide if the April 2023 incidents evidence would be admissible in a separate trial of the October 2022 case.

21

Aguilar contends the joint trial was fundamentally unfair for much the same reasons as he asserts regarding the court's granting of the People's consolidation motion.

Aguilar also relies on the differences in Doe's trial testimony from the People's proffer in support of their consolidation motion to argue the trial evidence of his intent to force Doe to orally copulate him on April 10, 2023 was weak. He contends, among other things, that this evidence shows he did not hold Doe down, that Doe testified that she did not believe she used the word "demand" when talking to police or the district attorney's office about Aguilar's insistence of sex on April 10 and testified that he "asked her" to orally copulate him, that she at one point told police, "I shouldn't say he was trying to force me" and that he did not use a lot of force, that she testified that he moved her head towards him but not that he pushed it down or that he moved his hips at that point, that his penis never touched Doe and she did not touch it, that in the past it had not been unusual for the two to have oral sex, and that his penis was flaccid rather than hard as it had been during those previous sexual encounters.

We disagree with Aguilar's view of Doe's testimony. Her account of Aguilar's actions on April 10, 2023 is very compelling. She was precise and detailed in her descriptions of what he said and did—such as that he exposed his penis and said, " 'Suck my dick,' " insisted three times in a row that she touch his penis, grabbed her head and attempted to push it towards him as she resisted for three to five minutes, pushed his groin area up and towards her, accused her of " 'suck[ing] Rick's dick,' " threatened to kill her, and, after they exited her car, threatened to "fuck [her] up" if she left before he gave her a letter from an ex-boyfriend.

22

Further, Aguilar's contentions are not particularly relevant to the inquiry of whether Aguilar intended to force Doe, including by duress, menace or fear of immediate and unlawful bodily injury, to orally copulate him.[4]  Of that, Doe's trial testimony leaves little doubt.  She indicated that Aguilar, appearing out of nowhere, forced his way against her wishes into the driver's side of her car and sat partially on top of her, putting a leg over one of hers.  Regardless of whether he asked or demanded oral sex from Doe or what she told police about his use of force, she testified that when she refused him, he attempted for three to five minutes to force her head towards him as she attempted to turn it away, a significant period of time, and then raised his groin area towards her.  And he threatened to kill her.  Doe further testified that she feared he would hurt her.  This testimony is damning.  It establishes that Aguilar intended to force Doe, physically, by duress, or by threat of harm, to orally copulate him.

Further, regardless of what sex the two might have had in the past as a couple, prior to April 10, 2023, Doe had obtained a restraining order against Aguilar, repeatedly called the police when he came near her, and finalized her divorce of him.  These facts, combined with Doe's account of Aguilar's sudden appearance, exposure of his penis, and insistence that she orally copulate him in the middle of the day in her car at her workplace despite her repeated refusal, makes Aguilar's contention that a reasonable juror could well have found he was merely seeking Doe's voluntary participation in a sex act to be utterly unpersuasive.

---

[4] The trial court instructed the jury that a defendant was guilty of unlawful oral copulation if, among other things, the subject did not consent to the act and "[t]he defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to someone." Aguilar does not contest the propriety of these instructions.

In short, Aguilar fails to show the joint trial of the two cases was fundamentally unfair to him. His due process claim is without merit.

**B.** ***The Trial Court's Admission of the Evidence of the Ring Camera Incident Is Not a Basis for Reversal***

Aguilar next argues the trial court prejudicially erred by admitting the evidence of one of the four prior uncharged acts heard by the jury, that being the evidence that in March 2023 Aguilar called Doe on the phone and knocked on her back door, stating that he wanted to have sex with her, and, upon being rebuffed by her, ripped out her back patio ring camera (the ring camera incident). Aguilar argues this evidence was unduly prejudicial under Evidence Code section 352 and its admission violated his constitutional due process rights. We conclude that, assuming solely for the sake of argument that the trial court erred in admitting this evidence, such an error was undoubtedly harmless. Therefore, we reject Aguilar's claim without addressing its merits or the People's argument that Aguilar forfeited a part of his merits argument.

**1. The Relevant Proceedings Below**

As we have discussed, the prosecution sought to introduce evidence that Aguilar had engaged in four prior uncharged bad acts. Aguilar objected to the admission of the evidence under Evidence Code 352. At an Evidence Code section 402 hearing, the trial court heard the proffered evidence, including of the ring camera incident, all of which consisted of Jane Doe's testimony. Her testimony was much the same as her trial testimony, which we have already summarized, except she testified the incident occurred about three weeks before March 18, rather than on March 18 itself as the prosecution indicated at trial.

The trial court concluded the evidence of the ring camera incident was admissible as a violation of the temporary restraining order "in that it

24

involved destruction of property and would qualify as disturbing the peace and so forth," but that it was not admissible as a domestic violence incident to show propensity or common plan evidence under Evidence Code section 1109.

### 2. Legal Standards

Evidence Code section 1101, subdivision (a) generally prohibits evidence of character to prove conduct. However, evidence of a prior uncharged act may be admissible to prove a disputed material fact—other than criminal disposition—such as "identity, motive, intent, knowledge, or the absence of mistake or accident." (§ 1101, subd. (b); *Wang, supra*, 46 Cal.App.5th at p. 1075.)

Before admitting such evidence, a trial court must determine whether the probative value of the evidence is substantially outweighed by the probability that its admission will necessitate undue consumption of time or will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (§ 352; *Wang, supra*, 46 Cal.App.5th at p. 1075.)

We review the trial court's Evidence Code section 352 ruling for abuse of discretion. (See *People v. Ewoldt, supra*, 7 Cal.4th at p. 405; *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 75.) Aguilar contends state law error is evaluated for prejudicial effect by determining if it is reasonably probable he would have received a better result but for the error, citing *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.

As we have discussed, " '[t]he admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 805, quoting *Falsetta, supra*, 21 Cal.4th at p. 913.) Aguilar contends the federal standard for evaluating the prejudice for such an error is whether it was harmless beyond a reasonable doubt.

### 3. Analysis

We conclude that, whether we apply the state law or federal standard for error asserted by Aguilar, any error by the trial court in admitting the evidence of the ring camera incident (assuming arguendo there was error) was undoubtedly harmless.

Aguilar once more focuses a prejudice argument on his contention that the evidence of his intent to force Doe to orally copulate him on April 10, 2023 was particularly weak. Therefore, he contends, the admission of the evidence of the ring camera incident fatally prejudiced his chances of obtaining a better result at trial because the ring camera incident likewise involved his insistence on sex, and in the middle of the night at Doe's residence, circumstances that made the evidence particularly inflammatory, more so than the evidence of the three other uncharged prior acts and the April 10, 2023 incident.

We disagree for four reasons. First, the jury's verdict suggests it found Jane Doe's testimony regarding all of the incidents she described, charged and uncharged, to be credible. It had good reason to do so, as Doe's testimony included considerable detail and the defense did little if anything to effectively challenge her accounts. Doe testified that on five other occasions *other* than the ring camera and April 10, 2023 incidents, Aguilar forced himself upon her and/or threatened her, including three times in violation of a restraining order prohibiting him from having any contact with her. On October 21, 2022, Doe testified, he entered her car without her permission, refused to leave, and choked, punched, and hurt her. On March 13, 2023—despite having by this time been served with a permanent restraining order that prohibited him from contacting Doe or being in her vicinity—he disturbed her at home in the middle of the night by throwing things at a window. On the morning of April 3, 2023, by which time Doe had formally

26

divorced him, he followed her to work and threatened to "mess up" her car if she did not see him for lunch. Later that same day, he followed her home from work, demanded she stop her car and, when she did not, bumped her car with his and attempted to block her car with his own. And on April 8, 2023, he confronted her at a storage unit, fought with her stepfather, and pushed Doe as he called her a "whore."

The evidence of these incidents provided ample support for Doe's testimony that on April 10, 2023, Aguilar forced his way into her car and partially on top of her, insisted that she orally copulate him and, when she refused, grabbed her head and attempted to force it towards him, then pushed his groin area up and in her direction, and threatened to kill her. These actions are consistent with his sudden appearance and unpermitted entry of her car on October 21, 2022; with his refusal to abide by her wishes that he leave her alone on that same date; with the force he employed against her on October 21, 2022, when he repeatedly attacked her, on April 3, 2023 when he bumped her car with his own, and on April 8, 2023 when he fought with Rick and pushed Doe; with the threat he made on April 3, 2023 that he would damage her car if she did not do as he wished; with his tracking her down in her car on October 21, 2022 and twice on April 3, 2023; and with his disregard of the restraining order in both April 3, 2023 incidents and at the storage unit on April 8, 2023. In other words, there was ample evidence presented at trial, none of which Aguilar contends was inadmissible, that he repeatedly disregarded Doe's wishes, acted with force against her, endangered her physical well-being, and threatened her, including despite knowing a restraining order barred him from approaching her at all.

27

Second, as we have discussed, Doe's detailed testimony about Aguilar's actions on April 10, 2023 is very compelling. Over and over again, she was precise and detailed in her descriptions of what Aguilar said and did.

Third, there was nothing particularly inflammatory about Doe's testimony of what Aguilar said and did during the ring camera incident. She testified that he called and then appeared in the middle of the night at her house for a few minutes and told her to open the door because he wanted to have sex with her. When she refused to let him in, he left after apparently ripping out the back patio ring camera. In comparison to some of the other incidents, this was a relatively mild episode—he neither attacked nor threatened Doe, stayed only a few minutes, and left without attempting to force his way into the house. We fail to see any significant prejudice that could have been caused by Doe's recounting of this incident, particularly in light of her testimony about more serious bad acts by Aguilar in other incidents.

As for Aguilar's argument that the evidence of his intent to assault Doe with the intent to commit a felony on April 10, 2023 "was extremely weak," we have already discussed why we find it unpersuasive.

Aguilar's contention that the ring camera incident was particularly prejudicial because it was the only other time Doe testified that he insisted on having sex with her is also underwhelming. As our discussion has just suggested, his actions on April 10, 2023 were hardly those of a seducer; rather, his ugly, aggressive, sudden insistence that Doe orally copulate him after she had divorced him and obtained a court order barring him from approaching her indicate he was using force and threat in order to humiliate and harm her. As such, it was more similar to his conduct on October 21, 2022 when, upon her angering him, he physically attacked and hurt her in

28

her car, or on April 3, 2023 when he told her to pull over and, when she did not, bumped her car with his and forced her to stop.

Finally, the evidence of the ring camera incident was a small part of the trial. Doe's description of the incident amounted to only about four of nearly 100 pages of testimony. Further, the prosecutor did not highlight the incident in closing argument, referring to it once in the course of discussing Aguilar's restraining order violations without mentioning Aguilar's wanting to have sex.

In short, we have no doubt the jury would have found Aguilar guilty of all charges even if it had not considered the evidence of the ring camera incident. Therefore, any error by the trial court—error which we assume arguendo and do not find here—was harmless.[5]

## III. DISPOSITION

The judgment is affirmed.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
SIGGINS, J.[*]

---

[5] In light of our conclusion that the trial court did not commit multiple errors, we also reject Aguilar's argument that we must reverse the judgment because of the cumulative effect of the trial court's errors.

[*] Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.